UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TYRONE KEYS,

    Plaintiff,

v.                                              Case No: 8:18-cv-2098-T-36JSS

BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN and NFL
PLAYER DISABILITY AND
NEUROCOGNITIVE BENEFIT PLAN,

    Defendants.
_____

## **O R D E R**

This cause comes before the Court upon Defendants' Motion to Dismiss Counts I and III of Plaintiff's Complaint (Doc. 19) and Plaintiff's response in opposition (Doc. 22). In the Motion, Defendants argue that Plaintiff's Complaint, brought pursuant to the Employee Retirement Income Security Act ("ERISA"), should proceed under Count II alone because the remaining counts seek relief that does not exist under the statute. The Court, having considered the parties' submissions and being fully advised in the premises, will grant in part Defendants' Motion to Dismiss.

    **I.    STATEMENT OF FACTS[1]**

Plaintiff Tyrone Keys ("Keys") played in the National Football League ("NFL") for seven seasons as a defensive lineman. Doc. 1 at ¶ 5. He played from 1983 until he had to retire in 1989 due to football injuries to his back, knees, and shoulder. *Id.* Shortly after his NFL career ended, Keys submitted a disability claim to Defendant, the Bert Bell/Pete Rozelle NFL Player Retirement

---

[1] The following statement of facts is derived from Plaintiff's Complaint (Doc. 1), the allegations of which the Court must accept as true in ruling on the instant Motion to Dismiss. *See Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F. 2d 989, 994 (11th Cir. 1983).

Plan (the "Plan"), a multi-employer pension and welfare benefits plan. *Id.* at ¶ 2. Keys submitted the claim to the Plan administrators due to his significant football-induced impairments. *Id.* at ¶ 6.

At the time Keys submitted his initial disability claim, there were three relevant classifications of disability benefits: (i) Line of Duty Benefits, awarded to players who have a "substantial disablement" due to playing NFL football but who are considered not totally disabled; (ii) Football Degenerative Total and Permanent ("T&P") benefits awarded to players who are considered to be substantially prevented from engaging in any occupation, *i.e.* totally disabled, due to impairments caused by playing NFL football; and (iii) Inactive T&P Benefits, awarded to former NFL players who are found to be totally and permanently disabled but whose disability is considered to be unrelated to their NFL football careers. *Id.*

The claims administrators for the Plan include the Disability Initial Claims Committee (the "DICC"), an entity consisting of two people—one appointed by the NFL Players Association and one appointed by NFL management—and the Retirement Board (the "Board"), consisting of six people, three appointed by the NFL Players Association and three appointed by NFL management. *Id.* at ¶ 7. The DICC is the initial decision maker and the Board members are the plan fiduciaries who conduct the fiduciary review of a claim that has been denied. *Id.*[2]

In 1991, Keys submitted a claim for Line of Duty benefits. *Id.* at ¶ 9. Once Keys submitted his claim for Line of Duty benefits, the Plan's administrators sent him to one of its top orthopedic physicians, Hugh Unger, M.D., for an evaluation. *Id.* Dr. Unger performed his first evaluation of Keys on December 9, 1991, approximately two years after Keys' last season. *Id.* Dr. Unger noted that Keys suffered a herniated lumbar disc and tore the meniscus of his right knee in 1989,

---

[2] Defendant NFL Player Disability & Neurocognitive Benefit Plan (the "Disability Plan") is a multi-employer welfare benefit plan. *Id.* at ¶ 3. The Disability Plan has the same structure as the Plan and the Disability Board consists of the same people who sit on the Board. *Id.* at ¶ 8.

his last season. *Id.* Dr. Unger also noted that Keys sustained a cracked glenoid rim of his right shoulder while playing. *Id.* By 1991, Keys had been through knee, back, and shoulder surgeries for NFL-related injuries. *Id.*

After examining Keys in December 1991, Dr. Unger reported the following NFL- related impairments to the Plan's administrators, predicting that the impairments would degenerate further with time:

> Impression: Chondromalacia of the patella, bilateral Degenerative arthritis of the right shoulder and Glenolabrial disease
> Osteoarthritis of the medial and lateral patellar facets and of the medial femoral condyle
> Status post foraminotomy and discectomy, L4 5

*Id.* at ¶ 10. Dr. Unger also evaluated the degree of Keys' NFL-related impairments. *Id.* at ¶ 11. He reported that Keys had a 50 to 59 percent loss of use of his back as a result of playing in the NFL, a 30 to 49 percent loss of use of his shoulder as a result of playing in the NFL, and a 60 to 79 percent loss of use of both knees as a result of playing in the NFL. *Id.* In the additional remarks section of the report to the Board in 1991, Dr. Unger wrote as follows:

> This patient has multiple extremity involvements, with arthritis of the right shoulder, chondromalacia of both knees, and tear of the medial meniscus. It is anticipated that further degeneration in the right shoulder may develop in time and he may develop early arthritic changes in his knees.

*Id.*

The Board awarded Keys Line of Duty benefits based upon Dr. Unger's findings and opinions. *Id.* at ¶ 12. Dr. Unger examined Keys annually at the Plan administrator's request up until 1999. *Id.* At each examination, Dr. Unger found the same degree of NFL-related impairments. *Id.*

3

Keys was paid Line of Duty benefits for the maximum period available of five years. *Id.* at ¶ 13. Prior to those benefits expiring on December 1, 1997, Keys requested that his benefits be reclassified as T&P Football Degenerative disability benefits. *Id.* at ¶ 14. That request was denied in 1997. *Id.*

On May 7, 2002, Keys was involved in a minor automobile accident. *Id.* at ¶ 15. His car was hit from behind while stopped at a red light. *Id.* The accident aggravated his pre-existing professional football injuries but had no effect on the permanent injuries he sustained playing NFL football. *Id.* In September 2003, Keys re-applied for Football Degenerative T&P disability benefits. *Id.* at ¶ 16. In his application, he listed his impairing conditions caused by playing NFL football. *Id.* He relied upon the opinions of his treating physicians, an independent medical examination, and his medical history in attributing the following impairments to his NFL football career:

> Condition 1
> I have unfortunately cervical spondylosis with upper extremity radicular symptoms referred to as radiculopathy. I am unable to sit for much more than 10 minutes without having to stand. I am unable to stand for more than 5 minutes without having to sit.
>
> Condition 2
> I unfortunately have significant spondylosis lumbar spondylosis with facet arthropathy at multiple levels & lower extremity radiculopathy. I am unable to complete a work day because of having to constant alternate between sitting & standing every few minutes to relive (sic) the pain. I herniated my lumbar in the last NFL game.
>
> Condition 3
> I unfortunately have degenerative joint disease chondromalacia & osteochondrel defect of the humeral and osteochondrel defect of the humeral & osteochondral defect of the glenoid rim and degenerative tears of the glenoid. I am scheduled to begin pain management consultation next week. I landed on my shoulder & was never told that it was cracked by team doctors.
>
> Condition 4

> I have chondromalacia patella in both knees. I am unable to sit for more than 10 minutes without having to stand up to relieve the pain. I also cannot stand for more than 10 minutes because of the pain. I am to begin pain management consultation to include facet injection & associated trigger points and neural forarrminal (sic) injections.

*Id.*

Thereafter, the Plan's administrators sent Keys to one of their physician experts, Harold Selesnick, M.D. *Id.* at ¶ 17. After an extensive physical examination, Dr. Selesnick found that Keys was disabled due to NFL football injuries. *Id.* He wrote as follows:

> I believe that due to Mr. Keys' chronic cervical and lumbar injuries, right shoulder limitation of motion, and pain and bilateral knee degeneration arthritis with limitation of motion and pain, that he is unable to work in any occupation for remuneration or profit. I believe that these limitations are permanent and he is likely to worsen with time to the point that he will eventually require bilateral knee replacements and possible right shoulder replacement surgery. I believe the cervical degenerative arthritis and lumbar degenerative arthritis will likely progress with time as well.

*Id.*

After review of the application and the records that were submitted, on March 3, 2004, the Board awarded Keys Inactive T&P disability benefits, effective January 1, 2004. *Id.* at ¶ 18. Keys appealed through counsel, pointing out that all of the medical evidence indicated that he was totally and permanently disabled due to his NFL football career. *Id.*

After further review, and relying upon Dr. Selesnick's examination and report, the DICC approved Keys' claim for Football Degenerative T&P benefits at their meeting on April 7, 2004. *Id.* at ¶ 19. Football Degenerative T&P benefits were paid to Keys retroactive to January 1, 2004 and Keys repaid Inactive T&P benefits that he had received. *Id.*

The Plan requires continuing proof of total and permanent disability once a participant is awarded benefits. *Id.* at ¶ 20. Consequently, the Plan's administrators had their medical experts

examine Keys multiple times. *Id.* Each time, their experts found that Keys was totally disabled by his NFL career. *Id.*

In April 2011, the DICC deadlocked (1 to 1)[3] on whether Keys should receive ongoing T&P disability benefits as a result of a 2009 tax return. *Id.* at ¶ 21. Benefits were continued while Keys appealed the decision. *Id.*

Keys appealed the DICC's April 2011 decision to terminate his Football Degenerative disability benefits to the Board and advised the Board that he had been approved for Social Security ("SS") disability benefits[4] but he had not received the award decision. *Id.* at ¶ 23. Under the Plan, a player will be approved for Plan disability benefits if he is approved for SS disability benefits, unless four or more members of the Board determine the player has received SS disability benefits fraudulently. *Id.*

In August 2011, the classification "Football Degenerative" T&P benefits was revised and those benefits were thereafter designated as "Inactive A" T&P benefits. *Id.* at ¶ 24. "Inactive B" T&P benefits replaced the prior classification of "Inactive" T&P benefits. *Id.* Keys received Inactive A T&P benefits in September, October, and November 2011 while his appeal was pending. *Id.*

In November 2011, the Board upheld the DICC's April 2011 termination of benefits decision. *Id.* at ¶ 25. The Board took the position that Keys' earnings stated in his 2009 tax return were incompatible with T&P disability benefits. *Id.* The Board further alleged it received no evidence that Keys had been approved for SS disability benefits. *Id.*

---

[3] A DICC deadlock is a deemed denial under the Plan.
[4] In May 2011, Keys was awarded Social Security disability benefits. *Id.* at ¶ 22. The award was based upon Keys' orthopedic injuries from his NFL career leading to post-traumatic premature degenerative arthritis in his cervical and lumbar spine and knees. *Id.*

6

Keys reapplied for T&P disability benefits from the Plan in February 2012 and submitted the SS disability decision he had received by that time. *Id.* at ¶ 26. The DICC denied his claim by letter dated March 5, 2012, maintaining that articles and documents he submitted with his application indicated that he was still working. *Id.*

Keys appealed through counsel, pointing out that he performed limited charity work but did not have the capacity for full-time work due to his NFL-related impairments. *Id.* at ¶ 27. Key's tax returns were submitted with the appeal, showing that he was not engaged in any full-time employment. *Id.* At their meeting in November, 2012, the Board awarded Inactive B benefits to Keys, effective December 2011, based upon his re-application, his SS award, and his appeal. *Id.*

Keys appealed the Board's decision, pointing out that the classification was wrong and that he should have been awarded Inactive A benefits. *Id.* at ¶ 30. The Board denied his appeal at their meeting in May 2013, and Keys requested reconsideration. *Id.* After reconsideration, the Board awarded Inactive A benefits to Keys with an effective date of December 2013, subject to Keys providing additional information to the Plan administrators. *Id.* Specifically, Keys was asked to provide authorizations allowing the Plan administrators to obtain Keys' SS disability files and his federal tax returns, along with a list of any employment Keys had been engaged in after January 2004. *Id.* Keys was paid Inactive B benefits during this time period.

In February 2015, the Board terminated Keys' lnactive B benefits, alleging Keys failed to provide the requested information. *Id.* at ¶ 29. Counsel for Keys provided the information. *Id.* In July 2015, Keys' Inactive A benefits were reinstated retroactively to December 2013. *Id.*

Keys, through counsel, indicated that Inactive A benefits should have been retroactively awarded to December 2011, not December 2013. *Id.* at ¶ 30. Keys requested the difference between Inactive A benefits and Inactive B benefits for the period from December 2011 through November

7

2013. *Id.* Players classified as Inactive A receive greater monthly benefits than players classified as Inactive B. *Id.* at ¶ 30, n.3.

In August 2017, the Plan administrators notified Keys that the Board decided to deny his claim for additional benefits for the time period December 1, 2011 through November 2013 and was also terminating his Inactive A benefits. *Id.* at ¶ 31. The Board had determined that Keys was never entitled to Inactive A benefits (formerly Football Degenerative T&P benefits), and as a result was overpaid by $831,488.28 (the difference between Inactive A and Inactive B for the time period between January 1, 2004 until August 1, 2017). *Id.* The Board notified Keys that he would no longer be paid any disability benefits and that his monthly Inactive B T&P benefits would be applied as they accrued to the outstanding indebtedness of $831,488.28 due the Plan as a result of the overpayment. *Id.*

The Board notified Keys that when the Plan administrators reviewed Keys' SS file, they acquired a complete copy of a medical report from August 1, 2003, from Chet Janecki, M.D., that indicated Keys had been in a car accident in May 2002. *Id.* at ¶ 32. The Board alleged for the first time that it had not received or acquired Janecki's full report before June 2016. *Id.*

The Board erroneously maintained that Keys' 2003 application for T&P Football Degenerative disability benefits was "intentionally and materially incomplete and inaccurate" because he did not provide the details of the 2002 car accident in his application. *Id.* Further, the Board notified Keys that the car accident, rather than playing seven years in the NFL, was the "proximate cause of the impairments underlying [Keys'] 2003 application" and, therefore, Keys was never entitled to Football Degenerative/Inactive A benefits. *Id.*

Keys appealed the Board's determination, arguing that the longstanding impairments listed in his 2003 application were the result of playing NFL football, as was made clear by a reasonable

review of his medical records. *Id.* at ¶ 33. He pointed out that the car accident did not cause any of the NFL-related impairments he listed in his application, and that the ongoing award of benefits year after year by the Plan administrators, as well as the SS disability award, were based upon a significant volume of medical evidence that Keys remained totally and permanently disabled as a result of his NFL career. *Id.* He also pointed out that the DICC knew about the 2002 automobile accident prior to the award of Football Degenerative T&P benefits in 2004. *Id.*

The Board denied Keys' appeal by letter dated February 26, 2018. *Id.* at ¶ 34. Keys was advised that he had exhausted his administrative remedies and his only remaining alternative was to file suit under section 1132(a) of ERISA. *Id.* Keys has exhausted his administrative remedies as required. *Id.* at ¶ 35.

## II. LEGAL STANDARD

To survive a motion to dismiss, a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Labels, conclusions and formulaic recitations of the elements of a cause of action are not sufficient. *Id*. (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Furthermore, mere naked assertions are not sufficient. *Id*. A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face." *Id*. (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). The court, however, is not bound to accept as true a legal conclusion stated as a "factual allegation" in the complaint. *Id*.

## III. DISCUSSION

Keys sets forth three claims in his Complaint. Doc. 1. Count I seeks a declaration of rights under section 1132(a)(1)(B) of the Plan. Doc. 1 at ¶ 36. Count I asks the Court to declare that Defendants' decision that Keys owes the Plan due to overpayment and that Defendants have the right to offset the benefits that would otherwise be paid to Keys to reduce indebtedness was an abuse of discretion because Keys did not provide false information. *Id.*

Count II is a claim for benefits under section 1132(a)(1)(B). *Id.* at ¶ 37. In Count II, Keys alleges that Defendants' decision to deny him Inactive A benefits for the time period from December 2011 through November 2013 and to terminate his Inactive A benefits beginning August 2017 was an abuse of discretion. *Id.* Keys seeks Inactive A benefits in the sum of $144,000 ($6,000 per month for 24 months) spanning the time period from December 2011 through November 2013 when Keys was erroneously paid Inactive B benefits. *Id.* at ¶ 49. Keys also seeks Inactive A benefits from August 2017 to present at the rate of $9,000 per month. *Id.* at ¶ 50.

Count III sets forth a claim for "Estoppel Based Upon Silence Under [section] 1132(a)(1)(B)." *Id.* at ¶ 39. Count III asserts that Defendants previously had information about Keys' 2002 automobile accident in their possession but chose not to pursue any additional information until recently. *Id.* at ¶ 42. Under Count III, Keys seeks to retain the benefits previously paid to him, requesting that Defendants "be estopped from clawing back Inactive A . . . benefits paid to Keys." *Id.* at ¶¶ 47, 51.

### A. Count I

Defendants seek dismissal of Count I. Defendants contend that the relief Keys seeks—a declaration that he did not provide false information—does not exist under section 1132(a)(1)(B). Doc. 19 at p. 7. Defendants state: "Count I asks this Court to opine on the veracity of the documents

10

that Keys submitted, and to his state of mind in submitting such documents. This type of declaratory relief is not available under section [1132](a)(1)(B)." *Id.*

Keys responds that nothing within ERISA requires that a claimant set forth just one claim where he has been affected by separate decisions of a plan administrator. Doc. 22 at p. 3. Keys states that Count I seeks an enforcement of his rights under the Plan, a permissible purpose of ERISA. Specifically, Keys "seeks to enforce his rights under the plan to retain all of the disability benefits he has received and to prevent the offset of his continuing disability benefits because he did not submit false information." *Id.* at p. 5. Keys further asserts that Count I is narrowly tailored to address the issue of Defendants' clawback of $831,488.28 in benefits based on a provision in the Plan that allows for the recovery of overpayments. *Id.* at pp. 4-5.

Under section 1132(a)(1)(B), a plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "[T]hree distinct remedies" are available to a participant or beneficiary who initiates a section 1132(a)(1)(B) action: (1) the recovery of accrued benefits; (2) a declaratory judgment that he or she is entitled to benefits under the provisions of the plan; and (3) an order enjoining the plan administrator from improperly refusing to pay future benefits. *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1337 (11th Cir. 2006).

In *Heffner*, the Eleventh Circuit noted that although most ERISA cases seek orders requiring plans to provide "traditional benefit[s] such as covering a health care cost," cases which seek to remedy impositions that a plaintiff contends are contrary to their plan may be permissible actions "to enforce . . . rights under the terms of the plan." *Id.* at 1338 (quoting 29 U.S.C. § 1132(a)(1)(B)).

11

Here, Keys' claim in Count I for declaratory judgment is a claim seeking to enforce his rights under a provision of the Plan. The cited plan provision,[5] which discusses the recovery of overpayments, deals with the payment of benefits. Doc. 22 at pp. 4-5. A declaratory judgment on the issue would resolve the question of Keys' entitlement to benefits under the Plan, specifically, whether it was an abuse of discretion for Defendants to effectively revoke plan benefits by requiring reimbursement. Stated differently, Keys asks the Court to make a determination regarding Keys' benefits, based on a contractual provision in the Plan. That is a permissible purpose of section 1132(a)(1)(B)). *See Heffner*, 443 F.3d at 1337.

Further, Keys' claim in Count I for declaratory relief is not subsumed by Count II, as Defendants argue. In Count II, Keys asks the Court, among other things, to determine that Defendants' decision to terminate Inactive A benefits beginning August 2017 was an abuse of discretion. Defendants' decision to terminate Inactive A benefits beginning August 2017 was based on a finding that Keys was never entitled to Inactive A benefits between 2004 to 2017. Doc. 1 at ¶ 31. A finding by the Court that this decision was an abuse of discretion may mean that Keys was entitled to Inactive A benefits between 2004 and 2017 and may further mean that Keys is owed benefits (and therefore would not owe Defendants). However, a finding that Defendants did not abuse their discretion in determining that Keys was never entitled to Inactive A benefits from 2004 to 2017 would mean that Keys is not owed benefits and may have been overpaid.

In the latter instance, the question of whether Keys owes under the Plan's overpayment provision based on the submission of false information would still be at issue. The application of the overpayment provision is therefore a potentially distinct issue and may be properly brought in

---

[5] The overpayment provision states: "If false information submitted causes a player to receive benefits he is not entitled to, then future disability payment will be reduced by the amount of the overpayment." Doc. 22 at p. 4 (citing Plan § 11.12).

a separate claim for declaratory relief. Therefore, Defendants' Motion will be denied with respect to Count I.

### B. Count III

Defendants also seek dismissal of Count III. Defendants contend that the relief Keys seeks in this count—a claim for retention of benefits paid based on estoppel—also does not exist under section 1132(a)(1)(B) and is inadequately pleaded. Doc. 19 at p. 8. Defendants state that the Eleventh Circuit, in *Jones v. Am. General Life and Acc. Ins. Co.*, 370 F.3d 1065, 1069 (11th Cir. 2004), recognized a claim for estoppel when terms of a plan subject to ERISA are ambiguous and a participant seeks to enforce the terms of the plan as represented to him. *Id.* However, Defendants argue, Keys does not allege here either that the plan is ambiguous or that Defendants made representations to him about the plan. *Id.* at p. 9.

Keys characterizes a claim for estoppel under *Jones* as a claim for "offensive" estoppel. Doc. 22 at p. 7. Keys contends that he does not attempt to state a claim for *Jones* estoppel; rather, he asserts a theory of "defensive equitable estoppel, based upon the claims administrator's thirteen year[s] of silence, which has unquestionably prejudiced Keys." *Id.* Keys contends that there is nothing within ERISA that indicates that this form of equitable estoppel may not be applied. *Id.* at p. 8.

"ERISA preemption has an 'expansive sweep' and is not limited to state laws designed specifically to affect employee benefit plans." *Blue Cross & Blue Shield of Ala. v. Sanders*, 138 F.3d 1347, 1355 (11th Cir. 1998) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987)). "State common law claims relating to employee benefit plans, such as equitable estoppel, are preempted by ERISA." *Chiroff v. Life Ins. Co. of N. Am.*, 142 F. Supp. 2d 1360, 1364 (S.D. Fla. 2000) (internal quotation marks omitted).

Despite Keys' contention that nothing within ERISA indicates that the law of equitable estoppel may not be applied under section 1132(a)(1)(B), he does not cite any cases where a federal court enforced a theory of equitable estoppel other than as provided by the "narrow" exception in *Jones. Id.* Instead, Keys directs the Court to *Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 231-32 (1959), a case under the Federal Employer's Liability Act ("FELA"), for analogy. In *Glus*, the Supreme Court determined that a claimant could properly argue equitable tolling of the statute of limitations where the claimant's employer told him that he had seven years to file suit despite the fact that FELA required three years. *Id.* In so holding, the Supreme Court stated that nothing in the language or history of FELA indicated that equitable tolling could not apply. *Id.* Keys argues that the same reasoning in FELA applies to this case.

As an initial matter, Keys' analogy to *Glus* appears inconsistent with his representation that his estoppel claim is not related to "a misrepresentation of plan terms." Doc. 22 at p. 6. In any event, whether the Supreme Court's reasoning in *Glus* would apply to this ERISA case is questionable given other binding precedent. In particular, the Eleventh Circuit has held that estoppel cannot be used to alter the statutory requirement that ERISA plans "be 'established and maintained pursuant to a written instrument.'" *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir. 1986) (quoting 29 U.S.C. § 1102(a)(1)). Because of the statutory language, "oral representations cannot modify unambiguous terms of an employee benefit plan." *Heffner*, 443 F.3d 1330. *Accord Wright v. Aetna Life Ins. Co.*, 110 F.3d 762, 764 (11th Cir. 1997) ("[O]ral communications cannot modify an unambiguous ERISA plan document since ERISA specifically requires that plans be 'maintained' in writing.").

Notwithstanding the above, Keys cannot maintain his estoppel claim because he does not set forth the necessary elements. "Equitable estoppel consists of words or conduct which causes

14

another person to believe a certain state of things exists, and to consequently change his or her position in an adverse way." *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1076 (11th Cir. 2003) (internal quotation marks omitted). Under Florida law,

> [e]stoppel by silence or inaction may arise where the party to be estopped has a duty to speak or act and fails to do so. Where this silence or inaction is "negligent" or "culpable," it may constitute a "representation." However, the party claiming estoppel by silence or inaction must still prove it was "misled to [its] injury" by detrimentally changing its position in reliance on that silence or inaction. The party claiming estoppel must also prove that its reliance was "intended or reasonably anticipated" by the party to be estopped.

*United States Life Ins. Co. in the City of New York v. Logus Mfg. Corp.*, 845 F. Supp. 2d 1303, 1318 (S.D. Fla. 2012) (internal citations omitted).

A review of Count III shows that Keys does not allege that his reliance was intended or reasonably anticipated by Defendants. Keys claims that he was prejudiced by Defendants' years of silence because he was not able to have a "timely dialogue about the accident and its relationship to his condition." Doc. 1 at ¶ 46. But this concern appears to relate to Defendants' claim process and procedures rather than any common law theory of relief. Moreover, Keys does not explain what would have been different about the dialogue had he been notified by Defendants earlier.

It is unclear whether Keys may set forth a cognizable claim for equitable estoppel based upon silence under ERISA. Notwithstanding, Keys fails to set forth the required elements of a common law cause of action. Therefore, Defendants' Motion will be granted with respect to Count III.

Accordingly, it is hereby **ORDERED**:

1. Defendants' Motion to Dismiss (Doc. 19) is **GRANTED IN PART AND DENIED IN PART.**

2. Count III of Plaintiff's Complaint is **DISMISSED** without prejudice. Plaintiff is granted leave to file an amended complaint within **FOURTEEN (14) DAYS** of the date of this Order.

3. In all other respects, Defendants' Motion to Dismiss is **DENIED.**

**DONE AND ORDERED** in Tampa, Florida on May 28, 2019.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any