UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TYRONE KEYS,

    Plaintiff,

v.                                               Case No: 8:18-cv-2098-T-36JSS

BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN and NFL
PLAYER DISABILITY AND
NEUROCOGNITIVE BENEFIT PLAN,

    Defendants.
_____

# **ORDER**

This cause comes before the Court upon Defendants' Motion to Dismiss Count Three of Plaintiff's First Amended Complaint (Doc. 38) (the "Motion") and Plaintiff's response in opposition (Doc. 41). In the Motion, Defendants argue that Count III of Plaintiff's First Amended Complaint should be dismissed because a plaintiff cannot assert a claim for equitable estoppel based upon silence under the Employee Retirement Income Security Act, 29 U.S.C. § 1132 ("ERISA"). Plaintiff disagrees, arguing that the Court should allow his claim to proceed because the doctrine of equitable estoppel based upon silence furthers ERISA's scheme and goals. The Court, having considered the parties' submissions and being fully advised in the premises, will grant the Motion.

    **I.**        **STATEMENT OF FACTS**[1]

---

[1] The following statement of facts is derived from Plaintiff's First Amended Complaint (Doc. 35), the allegations of which the Court must accept as true in ruling on the instant Motion to Dismiss. *See Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F. 2d 989, 994 (11th Cir. 1983).

Plaintiff Tyrone Keys ("Keys") played in the National Football League ("NFL") for seven seasons as a defensive lineman. Doc. 35 at ¶ 5. He played from 1983 until he had to retire in 1989 due to football injuries to his back, knees, and shoulder. *Id.* Shortly after his NFL career ended, Keys submitted a disability claim to Defendant, the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Plan"), a multi-employer pension and welfare benefit plan. *Id.* at ¶¶ 2, 6. Keys submitted the claim to the Plan administrators due to his significant football-induced impairments. *Id.* at ¶ 6.

At the time Keys submitted his initial disability claim, there were three relevant classifications of disability benefits: (1) Line of Duty Benefits, awarded to players who have a "substantial disablement" due to playing NFL football but who are considered not totally disabled; (2) Football Degenerative Total and Permanent ("T&P") benefits awarded to players who are considered to be substantially prevented from engaging in any occupation, *i.e.* totally disabled, due to impairments caused by playing NFL football; and (3) Inactive T&P benefits, awarded to former NFL players who are found to be totally and permanently disabled but whose disability is considered to be unrelated to their NFL football careers. *Id.*

The administrators for the Plan (collectively, the "Plan Administrators") include (1) the Disability Initial Claims Committee (the "DICC"), an entity consisting of two people, one appointed by the NFL Players Association and one appointed by NFL management, and (2) the Retirement Board (the "Board"), an entity consisting of six people, three appointed by the NFL Players Association and three appointed by NFL management. *Id.* at ¶ 7. The DICC is the initial decision maker and the Board members are the Plan fiduciaries who conduct the fiduciary review of a claim that has been denied. *Id.*[2]

---

[2] Defendant NFL Player Disability & Neurocognitive Benefit Plan (the "Disability Plan") is a multi-employer welfare benefit plan. *Id.* at ¶ 3. The Disability Plan has the same structure as the Plan and the Disability Board consists of the same people who sit on the Board. *Id.* at ¶ 8.

In 1991, Keys submitted a claim for Line of Duty benefits. *Id.* at ¶ 9. Once Keys submitted his claim for Line of Duty benefits, the Plan Administrators sent him to one of its top orthopedic physicians, Hugh Unger, M.D., for an evaluation. *Id.* Dr. Unger performed his first evaluation of Keys on December 9, 1991, approximately two years after Keys' last season. *Id.* Dr. Unger noted that Keys suffered a herniated lumbar disc and tore the meniscus of his right knee in 1989, his last season. *Id.* Dr. Unger also noted that Keys sustained a cracked glenoid rim of his right shoulder while playing. *Id.* By 1991, Keys had been through knee, back, and shoulder surgeries for NFL-related injuries. *Id.*

After examining Keys in December 1991, Dr. Unger reported the following NFL- related impairments to the Plan Administrators, predicting that the impairments would degenerate further with time:

> Impression: Chondromalacia of the patella, bilateral Degenerative arthritis of the right shoulder and Glenolabrial disease
> Osteoarthritis of the medial and lateral patellar facets and of the medial femoral condyle
> Status post foraminotomy and discectomy, L4 5

*Id.* at ¶ 10. Dr. Unger also evaluated the degree of Keys' NFL-related impairments. *Id.* at ¶ 11. He reported that Keys had a 50 to 59 percent loss of use of his back as a result of playing in the NFL, a 30 to 49 percent loss of use of his shoulder as a result of playing in the NFL, and a 60 to 79 percent loss of use of both knees as a result of playing in the NFL. *Id.* In the additional remarks section of the report to the Board in 1991, Dr. Unger wrote as follows:

> This patient has multiple extremity involvements, with arthritis of the right shoulder, chondromalacia of both knees, and tear of the medial meniscus. It is anticipated that further degeneration in the right shoulder may develop in time and he may develop early arthritic changes in his knees.

*Id.*

The Board awarded Keys Line of Duty benefits based upon Dr. Unger's findings and opinions. *Id.* at ¶ 12. Dr. Unger examined Keys annually at the Plan Administrators' request up until 1999. *Id.* At each examination, Dr. Unger found the same degree of NFL-related impairments. *Id.*

Keys was paid Line of Duty benefits for the maximum period available of five years. *Id.* at ¶ 13. Prior to those benefits expiring on December 1, 1997, Keys requested that his benefits be reclassified as Football Degenerative T&P benefits. *Id.* at ¶ 14. That request was denied in 1997. *Id.*

On May 7, 2002, Keys was involved in a minor automobile accident. *Id.* at ¶ 15. His car was hit from behind while stopped at a red light. *Id.* The accident aggravated his pre-existing professional football injuries but had no effect on the permanent injuries he sustained playing NFL football. *Id.*

In September 2003, Keys re-applied for Football Degenerative T&P benefits. *Id.* at ¶ 16. In his application, he listed his impairing conditions caused by playing NFL football. *Id.* He relied upon the opinions of his treating physicians, an independent medical examination, and his medical history in attributing the following impairments to his NFL football career:

> Condition 1
> I have unfortunately cervical spondylosis with upper extremity radicular symptoms referred to as radiculopathy. I am unable to sit for much more than 10 minutes without having to stand. I am unable to stand for more than 5 minutes without having to sit.
>
> Condition 2
> I unfortunately have significant spondylosis lumbar spondylosis with facet arthropathy at multiple levels & lower extremity radiculopathy. I am unable to complete a work day because of having to constant alternate between sitting & standing every few minutes to relive (sic) the pain. I herniated my lumbar in the last NFL game.

> Condition 3
> I unfortunately have degenerative joint disease chondromalacia & osteochondrel defect of the humeral and osteochondrel defect of the humeral & osteochondral defect of the glenoid rim and degenerative tears of the glenoid. I am scheduled to begin pain management consultation next week. I landed on my shoulder & was never told that it was cracked by team doctors.
>
> Condition 4
> I have chondromalacia patella in both knees. I am unable to sit for more than 10 minutes without having to stand up to relieve the pain. I also cannot stand for more than 10 minutes because of the pain. I am to begin pain management consultation to include facet injection & associated trigger points and neural forarrminal (sic) injections.

*Id.*

Thereafter, the Plan Administrators sent Keys to one of their physician experts, Harold Selesnick, M.D. *Id.* at ¶ 17. After an extensive physical examination, Dr. Selesnick found that Keys was disabled due to NFL football injuries. *Id.* He wrote as follows:

> I believe that due to Mr. Keys' chronic cervical and lumbar injuries, right shoulder limitation of motion, and pain and bilateral knee degeneration arthritis with limitation of motion and pain, that he is unable to work in any occupation for remuneration or profit. I believe that these limitations are permanent and he is likely to worsen with time to the point that he will eventually require bilateral knee replacements and possible right shoulder replacement surgery. I believe the cervical degenerative arthritis and lumbar degenerative arthritis will likely progress with time as well.

*Id.*

After review of the application and the records that were submitted, on March 3, 2004, the Board awarded Keys Inactive T&P disability benefits, effective January 1, 2004. *Id.* at ¶ 18. Keys appealed through counsel, pointing out that all of the medical evidence indicated that he was totally and permanently disabled due to his NFL football career. *Id.*

After further review, and relying upon Dr. Selesnick's examination and report, the DICC approved Keys' claim for Football Degenerative T&P benefits at their meeting on April 7, 2004.

5

*Id.* at ¶ 19. Football Degenerative T&P benefits were paid to Keys retroactive to January 1, 2004 and Keys repaid Inactive T&P benefits that he had received. *Id.*

The Plan requires continuing proof of total and permanent disability once a participant is awarded benefits. *Id.* at ¶ 20. Consequently, the Plan Administrators had their medical experts examine Keys multiple times. *Id.* Each time, their experts found that Keys was totally disabled by his NFL career. *Id.*

In April 2011, the DICC deadlocked (1 to 1)[3] on whether Keys should receive ongoing T&P benefits as a result of a 2009 tax return. *Id.* at ¶ 21. Benefits were continued while Keys appealed the decision. *Id.*

Keys appealed the DICC's April 2011 decision to terminate his Football Degenerative T&P benefits to the Board and advised the Board that he had been approved for Social Security ("SS") disability benefits[4] but he had not received the award decision. *Id.* at ¶ 23. Under the Plan, a player will be approved for benefits if he is approved for SS disability benefits, unless four or more members of the Board determine the player has received SS disability benefits fraudulently. *Id.*

In August 2011, the classification "Football Degenerative" T&P benefits was revised and those benefits were thereafter designated as "Inactive A" T&P benefits. *Id.* at ¶ 24. "Inactive B" T&P benefits replaced the prior classification of "Inactive" T&P benefits. *Id.* Keys received Inactive A T&P benefits in September, October, and November 2011 while his appeal was pending. *Id.*

---

[3] A DICC deadlock is a denial under the Plan.
[4] In May 2011, Keys was awarded SS disability benefits. *Id.* at ¶ 22. The award was based upon Keys' orthopedic injuries from his NFL career leading to post-traumatic premature degenerative arthritis in his cervical and lumbar spine and knees. *Id.*

In November 2011, the Board upheld the DICC's April 2011 termination of benefits decision. *Id.* at ¶ 25. The Board took the position that Keys' earnings stated in his 2009 tax return were incompatible with T&P disability benefits. *Id.* The Board further alleged it received no evidence that Keys had been approved for SS disability benefits. *Id.*

Keys reapplied for T&P disability benefits in February 2012 and submitted the SS disability decision he had received by that time. *Id.* at ¶ 26. The DICC denied his claim by letter dated March 5, 2012, maintaining that articles and documents he submitted with his application indicated that he was still working. *Id.*

Keys appealed through counsel, pointing out that he performed limited charity work but did not have the capacity for full-time work due to his NFL-related impairments. *Id.* at ¶ 27. Key's tax returns were submitted with the appeal, showing that he was not engaged in any full-time employment. *Id.* At their meeting in November, 2012, the Board awarded Inactive B benefits to Keys, effective December 2011, based upon his re-application, his SS award, and his appeal. *Id.*

Keys appealed the Board's decision, pointing out that the classification was wrong and that he should have been awarded Inactive A benefits. *Id.* at ¶ 28. The Board denied his appeal at their meeting in May 2013, and Keys requested reconsideration. *Id.* After reconsideration, the Board awarded Inactive A benefits to Keys with an effective date of December 2013, subject to Keys providing additional information to the Plan Administrators. *Id.* Specifically, Keys was asked to provide authorizations allowing the Plan Administrators to obtain Keys' SS disability files and his federal tax returns, along with a list of any employment Keys had been engaged in after January 2004. *Id.* Keys was paid Inactive B benefits during this time period. *Id.*

In February 2015, the Board terminated Keys' Inactive B benefits, alleging Keys failed to provide the requested information. *Id.* at ¶ 29. Counsel for Keys provided the information. *Id.* In July 2015, Keys' Inactive A benefits were reinstated retroactively to December 2013. *Id.*

Keys, through counsel, indicated that Inactive A benefits should have been retroactively awarded to December 2011, not December 2013. *Id.* at ¶ 30. Keys requested the difference between Inactive A benefits and Inactive B benefits for the period from December 2011 through November 2013. *Id.* Players classified as Inactive A receive greater monthly benefits than players classified as Inactive B. *Id.* at ¶ 30, n.3.

In August 2017, the Plan Administrators notified Keys that the Board decided to deny his claim for additional benefits for the time period December 1, 2011 through November 2013 and was also terminating his Inactive A benefits. *Id.* at ¶ 31. The Board had determined that Keys was never entitled to Inactive A benefits (formerly Football Degenerative T&P benefits), and as a result was overpaid by $831,488.28 (the difference between Inactive A and Inactive B for the time period between January 1, 2004 until August 1, 2017). *Id.* The Board notified Keys that he would no longer be paid any disability benefits and that his monthly Inactive B benefits would be applied as they accrued to the outstanding indebtedness of $831,488.28 due the Plan as a result of the overpayment. *Id.*

The Board notified Keys that when the Plan Administrators reviewed Keys' SS file, they acquired a complete copy of a medical report from August 1, 2003, from Chet Janecki, M.D., that indicated Keys had been in a car accident in May 2002. *Id.* at ¶ 32. The Board alleged for the first time that it had not received or acquired Janecki's full report before June 2016. *Id.*

The Board erroneously maintained that Keys' 2003 application for Football Degenerative T&P benefits was "intentionally and materially incomplete and inaccurate" because he did not

8

provide the details of the 2002 car accident in his application. *Id.* Further, the Board notified Keys that the car accident, rather than playing seven years in the NFL, was the "proximate cause of the impairments underlying [Keys'] 2003 application" and, therefore, Keys was never entitled to Football Degenerative T&P or Inactive A benefits. *Id.*

Keys appealed the Board's determination, arguing that the longstanding impairments listed in his 2003 application were the result of playing NFL football, as was made clear by a reasonable review of his medical records. *Id.* at ¶ 33. He pointed out that the car accident did not cause any of the NFL-related impairments he listed in his application, and that the ongoing award of benefits year after year by the Plan Administrators, as well as the SS disability award, were based upon a significant volume of medical evidence that Keys remained totally and permanently disabled as a result of his NFL career. *Id.* He also pointed out that the DICC knew about the 2002 automobile accident prior to the award of Football Degenerative T&P benefits in 2004. *Id.*

The Board denied Keys' appeal by letter dated February 26, 2018. *Id.* at ¶ 34. Keys was advised that he had exhausted his administrative remedies and his only remaining alternative was to file suit under ERISA. *Id.* Keys has exhausted his administrative remedies as required. *Id.* at ¶ 35.

## II. LEGAL STANDARD

To survive a motion to dismiss, a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Labels, conclusions and formulaic recitations of the elements of a cause of action are not sufficient. *Id*. (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Furthermore, mere naked assertions are not sufficient. *Id*. A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is

9

plausible on its face." *Id*. (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). The court, however, is not bound to accept as true a legal conclusion stated as a "factual allegation" in the complaint. *Id*.

### III. DISCUSSION

Count III of Keys' First Amended Complaint is a claim for "Equitable Estoppel Based Upon Silence Under § 1132(a)(1)(B)." Doc. 35 at p. 11. In Count III, Keys asserts that the Plan Administrators should be "estopped from clawing back benefits paid to Keys based upon an event that the Plan [A]dministrators knew occurred, but intentionally remained silent about, for thirteen years." *Id.* at ¶ 52.

Keys alleges that when he applied for Football Degenerative T&P benefits in 2003, he voluntarily submitted medical records, including "the second page of a report dated September 5, 2003 from chiropractor Richard Shaker" which referenced Keys' 2002 auto accident. *Id.* at ¶ 39. Specifically, Dr. Shaker's report stated that "earlier imaging studies had 'revealed an abnormal degree of degenerative osteoarthritis in Mr. Keys' cervical spine, lumbar spine, and knees which were all existing prior to the May 7th, 2002 accident.'" *Id.* at ¶ 39. According to Keys, the DICC conducted multiple claim reviews which involved review of Keys' medical records, including Dr. Shaker's report. *Id.* at ¶¶ 40-42. Though the DICC had knowledge as early as 2003 that Keys had been involved in an accident, it chose not to pursue any additional information. *Id.* at ¶ 42. Only years later did the Board "suddenly declare[] the Plan [A]dministrators had been duped by Keys when he applied for benefits in 2003 because he 'fraudulently' withheld information concerning the 2002 car accident in his application." *Id.* at ¶ 43.

The sole issue before the Court is whether Keys may maintain a claim for equitable estoppel based upon silence under § 1132(a)(1)(B).[5] As discussed in previous orders of this Court, under ERISA, a plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "[T]hree distinct remedies" are available to a participant or beneficiary who initiates a § 1132(a)(1)(B) action: (1) the recovery of accrued benefits; (2) a declaratory judgment that he or she is entitled to benefits under the provisions of the plan; and (3) an order enjoining the plan administrator from improperly refusing to pay future benefits. *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1337 (11th Cir. 2006).

"ERISA preemption has an 'expansive sweep' and is not limited to state laws designed specifically to affect employee benefit plans." *Blue Cross & Blue Shield of Ala. v. Sanders*, 138

---

[5] This is Keys' second attempt to state a cause of action for equitable estoppel based upon silence under ERISA and Defendants' second effort to have the Court dismiss the count. In their first motion to dismiss, Defendants argued that a cause of action for equitable estoppel based upon silence under ERISA does not exist and that, in any event, Keys' claim was inadequately pled. Doc. 19 at p. 8.

In its prior Order addressing Defendants' first motion to dismiss, the Court noted it was unclear whether Keys could state a cognizable claim for equitable estoppel based upon silence under § 1132(a)(1)(B). Doc. 28 at p. 15. Notwithstanding, the Court dismissed Count III based upon Keys' failure to set forth the required elements of a common law cause of action for equitable estoppel based upon silence (regardless of whether the claim was brought under ERISA). *Id.* Specifically, the Court noted that Keys failed to state a common law claim for equitable estoppel based upon silence because he did not allege that his reliance was intended or reasonably anticipated by Defendants and did not allege what would have been different about the dialogue between the parties had he been notified by Defendants earlier. *Id.* (citing *United States Life Ins. Co. in the City of New York v. Logus Mfg. Corp.*, 845 F. Supp. 2d 1303, 1318 (S.D. Fla. 2012) (setting forth necessary elements of equitable estoppel by silence or inaction under Florida law)).

Count III of Keys' First Amended Complaint adds a number of allegations, including that the Plan Administrators "intended or reasonably anticipated that [Keys] would rely upon their silence" and that, had the Plan Administrators asked Keys earlier about the 2002 accident, he "would have had the contemporaneous opportunity to provide medical evidence that proved that none of the conditions for which Keys claimed disability in his application were caused by the automobile accident." Doc. 35 at ¶¶ 46-47. With these additional allegations, Keys appears to have adequately stated a common law claim for equitable estoppel based upon silence under Florida law. *See Logus Mfg. Corp.*, 845 F. Supp. 2d at 1318. Accordingly, the only question presently before the Court is whether Keys may maintain such a claim under ERISA's statutory scheme.

F.3d 1347, 1355 (11th Cir. 1998) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987)). Generally, "[s]tate common law claims relating to employee benefit plans, such as equitable estoppel, are preempted by ERISA." *Chiroff v. Life Ins. Co. of N. Am.*, 142 F. Supp. 2d 1360, 1364 (S.D. Fla. 2000) (internal quotation marks omitted). Because ERISA "specifically requires that plans be 'maintained' in writing," oral modifications of unambiguous plans are precluded, *Wright v. Aetna Life Ins. Co.*, 110 F.3d 762, 764 (11th Cir. 1997), and "the common law doctrine of estoppel cannot be used to alter this result." *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir. 1986). *See also Sanctuary Surgical Ctr., Inc. v. Aetna Inc.*, 546 Fed. Appx. 846, 852 (11th Cir. 2013) (stating equitable estoppel may not be relied upon to "enlarge or extend the coverage specified in a contract").

Consistent with the requirement that ERISA plans be maintained in writing, the Eleventh Circuit has recognized only a "very narrow common law doctrine" under § 1132(a)(1)(B) for equitable estoppel. *Jones v. Am. General Life and Acc. Ins. Co.*, 370 F.3d 1065, 1069 (11th Cir. 2004). Equitable estoppel is available under § 1132(a)(1)(B) only "where the plaintiff can show that (1) the relevant provisions of the plan at issue are ambiguous, and (2) the plan provider or administrator has made representations to the plaintiff that constitute an informal interpretation of the ambiguity." *Id.*

Defendants argue two things in the Motion. First, they argue Keys cannot maintain a claim for *Jones* estoppel because (a) the Plan unambiguously authorizes Defendants to recover overpayment of benefits and (b) Keys has not alleged that the Plan Administrators "affirmatively represented" anything to Keys. Doc. 38 at pp. 4-5. Second, Defendants argue, aside from the circumstances described in *Jones*, "there is no scenario under which Keys could state a viable

equitable estoppel claim" because ERISA preempts state common law claims for estoppel. *Id.* at p. 6.

Keys agrees Count III does not fit the framework of a *Jones* estoppel claim. *See* doc. 41 at p. 4. Keys states that unlike in *Jones*, where a plaintiff sought to obtain benefits as a result of defendants' misrepresentation, he "seeks to retain benefits already paid to him, *i.e.* to defend against the continuous claw back of his benefits." *Id.* Keys characterizes a *Jones* estoppel claim as a claim for "offensive" estoppel, distinguishable from Keys' claim for "defensive" estoppel. *Id.*

Keys does not direct the Court to any case law enforcing a theory of equitable estoppel under § 1132(a)(1)(B) other than as provided by the "narrow" exception in *Jones. Id.* Nonetheless, Keys asserts that *Jones* estoppel is not the only possible use of equitable estoppel under § 1132(a)(1)(B). *Id.* at pp. 5-8. Keys urges the Court to adopt a claim for defensive equitable estoppel based upon silence under § 1132(a)(1)(B), reasoning that such a theory furthers ERISA's scheme and goals. *Id.* (citing *Alexandra H. Oxford Health Ins. Inc. v. Freedom Access Plan*, 833 F.3d 1299, 1307 (11th Cir. 2016) ("In deciding whether to adopt a certain rule into the federal common law, courts must examine whether the proposed rule would further ERISA's scheme and goals."). Keys asserts such a claim for defensive equitable estoppel based upon silence furthers ERISA's scheme and goals for two reasons: (1) it protects Plan participants and (2) it does not infringe upon the uniformity in administration of the Plan benefits. *Id.* at pp. 5-7.

The Court is not convinced that it should recognize a new type of equitable estoppel claim under § 1132(a)(1)(B), as Keys urges. To do so would be inconsistent with the Eleventh Circuit's instruction that equitable estoppel under §1132(a)(1)(B) should be allowed under only one specific circumstance. *Jones*, 370 F.3d at 1069 (citing *Katz v. Comprehensive Plan of Grp. Ins.*, 197 F.3d 1084, 1090 (11th Cir. 1999) ("This circuit has created a very narrow common law doctrine under

[§ 1132(a)(1)(B)] for equitable estoppel. It is only available when (1) the provisions of the plan at issue are ambiguous, and (2) representations are made which constitute an oral interpretation of the ambiguity." (citations omitted))); *Sanctuary Surgical Ctr.*, 546 Fed. Appx. at 852 ("We have recognized equitable estoppel as an additional remedial road beyond the remedy paths explicitly authorized under [§ 1132(a)(1)(B)]. However, this alternative route is 'very narrow.'" (citation omitted)). Keys offers no explanation as to why the Court should ignore the Eleventh Circuit's directive that equitable estoppel under § 1132(a)(1)(B) be permitted only in "very limited" instances.

Keys argues that to deny him the ability to bring a claim for defensive equitable estoppel based upon silence under § 1132(a)(1)(B) would be to deny equity in a broader sense given the Plan Administrators' behavior regarding Keys' claims for benefits. *See* doc. 41 at p. 6. Keys argues that the Plan Administrators' "beyond-belated attack" based on information that was long at their disposal is clearly inequitable. *Id.* Keys further alleges that the Plan Administrators, fiduciaries who have duties of honesty, good faith, and fair dealing and who must act with care, skill, prudence and diligence, are not being honest and are not dealing fairly and in good faith. Doc. 35 at pp. 13-14. Rather, Keys "now believes it was the Plan [A]dministrators' intention all along to remain silent about the car accident" only to use that information later "as a weapon against Keys" should the parties reach a subsequent disagreement. *Id.*

The Court disagrees that a plan participant's inability to bring a claim for defensive equitable estoppel based upon silence under § 1132(a)(1)(B) forecloses relief based upon a fiduciary's questionable conduct. Rather, the Eleventh Circuit has recognized a right to "appropriate equitable relief" pursuant to § 1132(a)(3)(B)'s "catchall" provision, where a plaintiff does not have an "adequate remedy" under § 1132(a)(1)(B). *Jones*, 370 F.3d at 1072-73. In *Jones*,

14

the Eleventh Circuit held that the plaintiffs in that case could maintain an alternative claim for breach of fiduciary duty under § 1132(a)(3)(B) where they had allegedly relied on the plan fiduciaries' systemic pattern of misrepresentation concerning their benefits. *Id.* at 1071. *See also Burkley v. Alcatel-Lucent Ret. Income Plan*, No. 8:17-cv-1337-T-27-TBM, 2018 WL 4360620, at *2 (M.D. Fla. Sept. 13, 2018) (denying motion to dismiss claim for breach of fiduciary duty where plaintiff alleged that fiduciaries refused to respond to his requests for explanation and failed to provide complete and accurate calculations); *Turner v. Allstate Ins. Co.*, Nos. 2:13-cv-685-WKW, 2:15-cv-406-WKW, 2016 WL 5445068, at *6 (M.D. Ala. Sept. 27, 2016) ("[U]nder [§1132(a)(3)(B)], an ERISA plan administrator's misrepresentation or omission of material information may give rise to a cause of action for breach of fiduciary duty.").

Keys' claim in Count III, while presented as a claim for defensive equitable estoppel based upon silence, at times closely resembles a claim for breach of fiduciary duty, a sometimes-permissible alternative claim under § 1132(a)(3)(B). Given the potential availability of a claim for breach of fiduciary duty under ERISA, Keys' argument that not allowing his claim in Count III to proceed would deny him equity is without merit. The fact that Keys, who is the master of his complaint, chose not to bring a claim that might have provided other "appropriate equitable relief" under § 1132(a)(3)(B) does not require the Court to strain to adopt a new theory of law, particularly when that theory appears at odds with prior precedent. *See generally Braden v. Aetna Life Ins. Co.*, 597 Fed. Appx. 562, 568 (11th Cir. 2014) (noting that plaintiff's complaint sought remedies provided under § 1132(a)(1)(B) and did not discuss "other appropriate equitable relief" under § 1132(a)(3)(B)).

Given the circumstances here, the Court finds no sound reason to extend a claim for equitable estoppel under § 1132(a)(1)(B) beyond what the Eleventh Circuit has counseled is

15

appropriate. Keys fails to state a cognizable claim for defensive equitable estoppel based upon silence under § 1132(a)(1)(B). Therefore, Defendants' Motion will be granted.

Accordingly, it is hereby **ORDERED**:

1. Defendants' Motion to Dismiss (Doc. 38) is **GRANTED.**

2. Count III of Plaintiff's First Amended Complaint is **DISMISSED.** Plaintiff's First Amended Complaint will proceed on Counts I and II only.

**DONE AND ORDERED** in Tampa, Florida on November 12, 2019.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any