**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| TYRONE KEYS, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 8:18-cv-02098-CEH-JSS |
| | ) | |
| BERT BELL/PETE ROZELLE NFL PLAYER | ) | |
| RETIREMENT PLAN and the NFL PLAYER | ) | |
| DISABILITY & NEUROCOGNITIVE BENEFIT | ) | |
| PLAN, | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |
| | ) | |

**MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS / COUNTER-PLAINTIFFS**
**BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN AND**
**NFL PLAYER DISABILITY & NEUROCOGNITIVE BENEFIT PLAN**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

I.    The Retirement Plan and the Disability Plan ............................................................. 2

    A.    LOD benefits ............................................................................................ 3

    B.    T&P benefits .............................................................................................. 3

    C.    Recovery of overpayments ..................................................................... 4

II.    Keys Receives LOD Benefits. ................................................................................... 4

III.    Initial and Repeated Evaluations of Keys Find He Is Capable of Employment. .............................. 5

IV.    Keys Is In a Car Accident on May 7, 2002. ................................................................ 7

V.    Keys Applies Again for T&P Benefits in September 2003, and Hides Evidence of the Car Accident. ................................................................................................................. 7

VI.    The Plan Reviews Keys' Eligibility And Requests Information. ..................................... 9

VII.    Keys' Fraud is Uncovered, and the Board Reduces and Suspends Keys' T&P Benefits To Recover Prior Overpayments. ...................................................................................... 12

ARGUMENT & AUTHORITIES ........................................................................................ 14

I.    THE PLANS ARE ENTITLED TO SUMMARY JUDGMENT ON KEYS' CLAIMS. ............... 14

    A.    Count I fails because substantial evidence supports the Board's decision. ........................... 14

        1.    The Board reasonably concluded the car accident was the "but for" cause of Keys' disability, and therefore he was not entitled to Football Degenerative benefits. ............ 15

        2.    The Board reasonably determined that Keys' history of false, incomplete, and contradictory statements subjected him to a loss of benefits. ........................................ 17

            a)    Substantial evidence shows Keys concealed material evidence he knew would adversely impact his T&P application, and falsely represented that his conditions and the treatments for them were due solely to his NFL career... 18

            b)    Substantial evidence shows Keys did not disclose his receipt of workers' compensation benefits to avoid an offset. .......................................................... 19

            c)    Substantial evidence shows Keys provided false and contradictory information to the SSA about a number of things, including his ability to work. ................... 19

B.     Count II fails because the Board reasonably determined Keys was *never* entitled to Football Degenerative benefits....................................................................................20

II.     THE PLANS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST KEYS ON THEIR COUNTERCLAIMS..................................................................................................................... 20

A.     The Plans are entitled to equitable relief to recover nearly $1 million in overpayments. ......20

B.     The Plans are entitled to judgment against Keys to prevent his unjust enrichment. ..............21

C.     Keys' Affirmative Defenses To The Plans' Counterclaims Are Meritless. ...........................23

     1.     The Court should reject Keys' exhaustion argument. ....................................................23

     2.     The Court should reject Keys' limitations argument. ....................................................23

     3.     The Court should reject Keys' waiver argument............................................................23

     4.     The Court should reject Keys' argument that the Plan terms do not authorize equitable relief..............................................................................................................24

CONCLUSION ....................................................................................................................................25

# TABLE OF AUTHORITIES

Cases

*Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,*
694 F.3d 557 (5th Cir. 2012) ........................................................................................... 14

*Blue Heron Beach Resort Developer, LLC v. Branch Banking &Tr. Co.,*
No. 6:13-CV-372- ORL-36, 2014 WL 2625255 (M.D. Fla. June 12, 2014) ............................................. 25

*Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan,*
410 F.3d 1173 (9th Cir. 2005) ............................................................................................ 15

*Conkright v. Frommert,*
559 U.S. 506 (2010) ...................................................................................................... 25

*Courson v. Bert Bell NFL Player Ret. Plan,*
75 F. Supp. 2d 424 (W.D. Pa. 1999), *aff'd,* 214 F.3d 136 (3d Cir. 2000) ............................................... 15

*Digiacomo v. Prudential Ins. Co. of Am.,*
501 F. Supp. 2d 626 (D.N.J. 2007) ....................................................................................... 17

*Doyle v. Liberty Life Assur. Co. of Bos.,*
542 F.3d 1352 (11th Cir. 2008) ........................................................................................... 14

*Emery v. Am. Airlines, Inc.,*
56 F. Supp. 3d 1284 (S.D. Fla. 2014) .................................................................................... 14

*Firestone Tire & Rubber Co. v. Bruch,*
489 U.S. 101 (1989) ...................................................................................................... 14

*Glass v. United of Omaha Life Ins. Co.,*
33 F.3d 1341 (11th Cir. 1994) ............................................................................................ 23

*Great-W. Life &Annuity Ins. Co. v. Knudson,*
534 U.S. 204 (2002) ...................................................................................................... 21

*Hercules, Inc. v. Pages,*
814 F. Supp. 79 (M.D. Fla. 1993) ........................................................................................ 22

*Howard v. Hartford Life & Acc. Ins. Co.,*
929 F. Supp. 2d 1264 (M.D. Fla. 2013) .................................................................................. 16

*In re Garfinkle,*
672 F.2d 1340 (11th Cir. 1982) ........................................................................................... 23

*Johnson v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,*
468 F.3d 1082 (8th Cir. 2006) ............................................................................................ 14

*Lawrence v. Gen. Motors Hourly-Rate Emps. Pension Plan,*
No. 5:07-CV-408, 2010 WL 3788279 (M.D. Fla. Sept. 24, 2010) ...................................................... 17

iii

*Luby v. Teamsters Health, Welfare, & Pension Tr. Funds*,
   944 F.2d 1176 (3d Cir. 1991) ................................................................................ 22

*Manning v. Johnson & Johnson Pension Comm.*,
   504 F. Supp. 2d 1293 (M.D. Fla. 2007) ............................................................... 16

*Metro. Life Ins. Co. v. Solomon*,
   996 F. Supp. 1473 (M.D. Fla. 1998) .................................................................... 22

*Morris v. Nat'l Football League Ret. Bd.*,
   833 F. Supp. 2d 1374 (S.D. Fla. 2011), *aff'd*, 482 F. App'x 440 (11th Cir. 2012) ................................ 15

*Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Const. Co.*,
   932 F.2d 1443 (11th Cir. 1991) ........................................................................... 24

*Provident Life & Acc. Ins. Co. v. Waller*,
   906 F.2d 985 (4th Cir. 1990) ................................................................................ 22

*Reliance Standard Life Ins., Co. v. Smith*,
   No. 3:05-cv-467, 2006 WL 2993054 (E.D. Tenn. Oct. 18, 2006) ......................... 23

*Townsend v. Delta Family–Care Disability and Survivorship Plan*,
   295 F. App'x 971 (11th Cir. 2008) ....................................................................... 16

*Unum Life Ins. Co. of Am. v. O'Brien*,
   No. 6:03-CV1433-ORL18DAB, 2004 WL 2283559 (M.D. Fla. Oct. 4, 2004) ................................ 21, 22

*Webster v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
   129 F.3d 607 (5th Cir. 1997) ............................................................................... 15

*Williams v. BellSouth Telecomms., Inc.*,
   373 F.3d 1132 (11th Cir. 2004) ........................................................................... 14

*Witt v. Metro. Life Ins. Co.*,
   772 F.3d 1269 (11th Cir. 2014) ........................................................................... 23

<u>Statutes</u>

29 U.S.C. § 1001(b) ............................................................................................... 24

## **INTRODUCTION**

In February 2018, the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Retirement Plan" or "Plan") reduced and then terminated Plaintiff Tyrone Keys' disability benefits after determining he had provided false and incomplete information to the Plan for years.  Keys sued to overturn that decision.

The key issue in this case is whether the Plan's decision to reduce and terminate Keys' disability benefits was reasonable under the abuse-of-discretion standard of review.  The record establishes it was. Keys deliberately and repeatedly failed to provide complete and accurate information to the Plan, including hiding the fact that he was in a car accident shortly before he applied for disability benefits—a car accident that his treating physician determined caused the very injuries for which he sought (and received) disability benefits from the Plan and a companion plan called the NFL Player Disability & Neurocognitive Benefit Plan ("Disability Plan," and together with the Retirement Plan "the Plans").

Numerous other examples of Keys' malfeasance are equally stark.  Among other things, Keys concealed his receipt of workers' compensation benefits to avoid an automatic reduction of his disability benefits under the Plan.  He submitted incomplete documents, and misrepresented the nature of other documents, to shore up a higher disability award than he would otherwise have been entitled to receive. And he provided patently false or contradictory information to the Social Security Administration, the Plan, or both, whenever it suited him, to secure benefits from whatever source was available.

Keys has been remorseless in the face of his misdeeds.  When confronted, he tried to justify his actions, but each excuse further incriminated him in a years-long campaign of deception.  While Keys will undoubtedly portray himself as a victim, he is no victim.  The real victims are the Plans and their participants who play by the rules, provide truthful and accurate information, and get the benefits they actually deserve.

Given Keys' repeated concealment of relevant information and Keys' very own treating physician attributing Keys' permanent injuries to the car accident, among other things, the Plans' reduction and termination of Keys' benefits was eminently reasonable.  All told, the Plans have overpaid Keys by approximately $1 million, excluding interest.

If the Plan's decision was reasonable, the second issue in this case is whether the Plans can recover their overpayments, either by tracing and reclaiming their funds as an equitable remedy under ERISA, or by securing a judgment against Keys' general assets under a theory of unjust enrichment. The Plan Documents plainly authorize the recovery of overpayments through any means, including the counterclaims asserted here. Keys' arguments to the contrary and his other defenses to the Plans' counterclaims are meritless.

For these reasons, as explained more fully below, the Court should uphold the Plan's decision and enter judgment against Keys on the Plans' counterclaims.[1]

## BACKGROUND

### I.      The Retirement Plan and the Disability Plan

The Retirement Plan provides retirement, disability, and related benefits to eligible former NFL players ("Players"). Retirement Plan Doc. ("RPD") at Intro. [AR-7].[2] The Plan was created and is maintained under collective bargaining agreements between the NFL Management Council and the NFL Players Association. RPD at Intro. [AR-7].

The Retirement Board is the administrator and named fiduciary of the Retirement Plan. RPD § 1.3 [AR-8]. It has six voting members. Three are appointed by the NFL Players Association, and three are appointed by the NFL Management Council. RPD § 8.1 [AR-35]. The Board has "full and absolute discretion, authority and power to interpret, control, implement, and manage the Plan," RPD § 8.2 [AR-35-36], including the authority to construe the terms of the Plan, adopt procedures and rules for administering the Plan, decide benefit claims, and bring suit on behalf of the Plan. RPD § 8.2 (a), (b), (d), (i) [AR-36].

---

[1] On November 12, 2019, the Court granted the Plans' motion to dismiss Count III of Keys' First Amended Complaint (ECF 55). The Court ruled that Keys could not maintain his claim that the Plans are equitably estopped from recovering their overpayments.

[2] Cites like "AR-7" refer to specific pages within the Administrative Record (ECF 56). The AR cites omit a bates prefix and any zeros preceding the page number. Unless stated otherwise, "RPD" cites refer to the 2001 Bert Bell/Pete Rozelle NFL Player Retirement Plan in effect when Keys first applied for and was awarded total and permanent disability benefits.

The Retirement Plan provides two types of disability benefits to Players:  line-of-duty disability ("LOD") benefits and total and permanent disability ("T&P") benefits.

### A.     LOD benefits

**LOD benefits** go to Players who have a "substantial disablement" arising from NFL football. 11/13/86 RPD §§ 6.1, 6.4.[3]  LOD benefits are payable for 60 months.  11/13/86 RPD § 6.1.  The monthly benefit is reduced by the amount of any workers' compensation payments to a Player.  11/13/86 RPD § 6.3.

### B.     T&P benefits

A Player is entitled to **T&P benefits** if he is substantially prevented from or unable to engage in any occupation for remuneration or profit.  RPD § 5.2 [AR-27].  Four categories of T&P benefits are available, depending on the timing and cause of a Player's total and permanent disability.  RPD § 5.1 [AR-25- 26].  Two categories are relevant here.  The first is "**Football Degenerative**" benefits,[4] which apply if a Player's "disability(ies) arises out of  League football activities, and results in total and permanent disability before the later of (1) age 45, or (2) 12 years after the end of [his] last Credited Season."  RPD § 5.1(c) [AR-25].  The Retirement Plan defines "arising out of League football activities" and specifies that it "does not include… a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities."  RPD § 6.4(c) [AR-32].  "**Inactive**" benefits are the other category of T&P benefits at issue.[5]  A Player receives Inactive T&P benefits if "(1) the total and permanent disability arises from other than League football activities…, or (2) the disability(ies) arises out of League football activities, and results in total and permanent disability after the later of (i) age 45, or (ii) 12 years after the end of the Player's last Credited Season."  RPD § 5.1(d) [AR-26].

A Player receiving Football Degenerative benefits is automatically entitled to a supplemental benefit under the Disability Plan.  *See* RPD §§ 5.1(c), 5.1(d) [AR-25- 26] (noting minimum monthly

---

[3] Plan Section 6.5 states that a prior version of the Retirement Plan applies to applications for LOD benefits received prior to April 1, 2002.  RPD § 6.5 [AR-32].  The Bert Bell NFL Player Retirement Plan (restated November 13, 1986) governed Keys' LOD application.  Relevant portions are cited here and attached as **Exhibit I** to this brief.

[4] Football Degenerative benefits were later renamed "Inactive A" benefits.  8/1/11 RPD § 5.10 [AR-105].

[5] Inactive benefits were later renamed "Inactive B" benefits.  8/1/11 RPD § 5.10 [AR-105].

payments for Football Degenerative and Inactive benefits); 4/1/01 Disability Plan Doc. ("DPD") § 3.1 [AR-254] (explaining that Players receiving Football Degenerative benefits under the Retirement Plan will automatically be eligible for supplemental benefits from the Disability Plan). The Disability Plan was created to provide additional benefits that the Retirement Plan could not provide under federal law.

### C.        Recovery of overpayments

The Retirement Plan has two overpayment provisions. The first authorizes the Board to "[r]ecover any overpayment of benefits through reduction or offset of future benefit payments or other method." RPD § 8.2(n) [AR-37].[6] The second recognizes the interrelationship between the Plans, and applies where a Player's false submissions to the Retirement Plan lead to automatic disability (over)payments from the Disability Plan. The provision states:

> If false information submitted by or on behalf of a Player causes the Player to receive amounts under the NFL Player Supplemental Disability Plan ("Disability Plan") to which such Player is not entitled, any future disability benefits payable to the Player… under Articles 5 or 6 [of the Retirement Plan] will be reduced by the amount of the overpayment from the Disability Plan, plus interest at the rate of 6% per year.

RPD § 11.12 [AR-50].[7]

## II.        Keys Receives LOD Benefits.

The Plan received Keys' application for LOD benefits on December 16, 1991. 11/11/91 Appl. [AR-441]. The application asked whether Keys had applied for or received workers' compensation benefits. 3/18/91 Ltr. fr. S. Meizlik to T. Keys ("Please complete and return the application and indicate whether you have applied for Worker's Compensation benefits.") [AR-424]; 11/11/91 Appl. (asking "Have you ever applied for Workmen's Compensation?" and "What was the result of your application?") [AR-441]. Keys dated the application November 11, 1991, indicated he had a ***pending*** application for workers'

---

[6] The current versions of the Retirement Plan and Disability Plan contain the same provision. 4/1/17 RPD § 8.2(o) [AR-205]; 4/1/17 DPD § 9.2(o) [AR-353].

[7] The current version of the Retirement Plan contains the same provision. 4/1/17 RPD § 12.12 [AR-221]. The current version of the Disability Plan contains a corresponding provision that calls for the reduction of future benefits payable under the Retirement Plan to recover overpayments from the Disability Plan. 4/1/17 DPD § 13.11 [AR-364].

compensation benefits, and certified that "all information on this form is true to the best of [his] knowledge." 11/11/91 Appl. [AR-441].

On November 26, 1991—just days after the date that appears on the signature line of Keys' application, and several weeks before the Plan received it—Keys received a workers' compensation award in the amount of at least $39,130. *See* 12/18/91 Op. on Reconsid. [AR-1150- 51] (describing Keys' temporary and permanent disability awards).

The Board approved Keys' application for LOD benefits, effective January 1, 1992. 3/3/92 Ltr. fr. S. Gaunt to T. Keys [AR-496]. Keys eventually received LOD benefits totaling $84,780. Decl. of Chrisopher Bagosy ("Bagosy Decl.," **Ex. J**) ¶ 3. Keys received annual reminders of his obligation to report any workers' compensation award. 12/16/92 Ltr. fr. S. Gaunt to T. Keys [AR-506] ("Under the Plan, you have a continuing obligation to promptly inform the Fund Office, if you have not already done so, of any Worker's Compensation payments."); 1/24/94 Ltr. fr. S. Gaunt to T. Keys [AR-518] (same); 2/6/95 Ltr. fr. S. Gaunt to T. Keys [AR-534] (same); 2/1/96 Ltr. fr. S. Gaunt to T. Keys [AR-548] (same); 2/6/97 Ltr. fr. S. Gaunt to T. Keys [AR-607] (same). Keys *never* reported the award during this timeframe.

### III.    Initial and Repeated Evaluations of Keys Find He Is Capable of Employment.

While Keys received LOD benefits, a Plan neutral physician, Dr. Unger, periodically examined Keys to assess his continuing eligibility for the benefit. Each time, Dr. Unger concluded Keys was not totally and permanently disabled, and he reported little change in Keys' condition. *See, e.g.*, 12/9/91 Unger Rpt. at 3 [AR-427] ("It is safe for this patient to work, as long as his occupation precludes overhead work, kneeling, squatting, climbing, bending, running, and heavy lifting over 25#.").[8]

---

[8] *See also* 3/4/93 Unger Rpt. at 2 [AR-512] ("In general, I don't find much change [in condition] and my restrictions would be the exact same as we had previously."); 3/4/93 Phys. Rpt. Form at 1 [AR-513] (indicating that Keys was not totally and permanently disabled, and could "engage in occupations that preclude bending, lifting, climbing, kneeling, squatting, and running"); 3/7/94 Unger Rpt. at 1-2 [AR-521-22] ("The patient fortunately has not deteriorated in the last three years. He has been active and has been doing exercises at home to maintain his tone. My feelings remain the same about participating in sports and his physical impairment rating."); 3/7/94 Phys. Rpt. Form at 2 [AR-524] ("There has been no change in the status of the patient from prior examinations…"); 3/24/95 Unger Rpt. [AR-537] ("There has been no dramatic change since his evaluation of March 7, 1994. My stipulation in 1994 was that he can engage in occupations that preclude bending, lifting, climbing, kneeling, squatting and running, and these stipulations

In 1996, Keys asked to be converted to T&P benefits.  3/8/96 Ltr. fr. T. Keys to S. Gaunt [AR-573].  Dr. Unger evaluated Keys on March 11, 1996, noted that Keys was "still doing the scholarship program,"[9] and reported that Keys was employable under "the same restrictions" imposed in 1991, five years earlier.  3/11/96 Unger Rpt. at 1-2 [AR-552- 53].  The Board denied Keys' request in the absence of any "significant medical information" and in light of Dr. Unger's conclusion that Keys was employable.  5/7/96 Ltr. fr. S. Gaunt to T. Keys at 1 [AR-557].  Keys appealed that decision, but the Board denied the appeal after Keys failed to provide any additional information bearing on his disability.  7/12/96 Ltr. fr. T. Keys to S. Gaunt [AR-602]; 2/3/97 Ltr. fr. S. Gaunt to T. Keys [AR-606].

Dr. Unger continued to evaluate Keys and reported little or no change in his condition.  In October 1997, Dr. Unger indicated Keys was employable and "had very little degeneration since [he] saw him initially."  10/3/97 Unger Note at 1 [AR-613].  In February 1999, Dr. Unger evaluated Keys a final time and concluded, again, that he was not totally and permanently disabled.  Dr. Unger summarized his history with Keys as follows:

> The first time the patient had been seen was on Dec. 9, 1991 and a narrative was submitted at that time.  In 1991 I felt that it was safe for him to work as long as his occupation precluded all the heavy work, kneeling, squatting, climbing, bending, running and heavy lifting.  I felt that the patient would never be able to return to professional football.

2/1/99 Unger Rpt. at 1 [AR-640].

> There has not been any further deterioration of all involved areas.

> His work restrictions remain the same as in prior years, no excess bending, lifting, climbing, kneeling, squatting or running.

2/1/99 Unger Rpt. at 3 [AR-642].

---

still exist."); 3/24/95 Phys. Rpt. Form at 2 [AR-539] (same).

[9] Since retiring from the NFL Keys has worked in various capacities with a charity called "All Sports Community Services."

**IV.     Keys Is In a Car Accident on May 7, 2002.**

Keys was in a car accident on May 7, 2002.  6/4/17 Ltr. fr. G. Culverhouse to Benefits Cmte [AR-3820].  Within days of the car accident, a chiropractor named Richard Shaker examined Keys and sent him to Chet Janecki, an orthopedic surgeon.  *See* 9/4/2003 Ltr. fr. C. Janecki [AR-1016] (noting Dr. Janecki first saw Keys on July 10, 2002); 8/1/03 Janecki Progress Note ("Janecki Accident Report") at 1 [AR-3586] (noting Shaker referred Keys for evaluation).  Dr. Shaker and Dr. Janecki both treated Keys for some time thereafter.

On August 1, 2003, Dr. Janecki issued a report stating, *inter alia*, that Keys had ongoing low back, leg, and knee pain, and those conditions and the treatments related to them were " the direct result of injuries that [Keys] sustained in" the May 2002 car accident.  Janecki Accident Report at 3 [AR-3588].

**V.      Keys Applies Again for T&P Benefits in September 2003, and Hides Evidence of the Car Accident.**

Keys reapplied for T&P benefits on September 13, 2003.  9/13/03 Appl. [AR-739- 44].  In the application, Keys stated he was disabled by neck, low back, shoulder, and knee injuries—the same conditions discussed in the Janecki Accident Report.  9/13/03 Appl. at 4 [AR-742].  When asked to "[d]escribe all accidents, injuries, or illnesses that did not result from NFL Football (*for example, auto accidents*) and may have caused or contributed in any way to any of the above conditions," Keys **did not** mention the 2002 car accident.  Instead, Keys wrote that "[a]ll injuries were the direct result of pro football unfortunately."  9/13/03 Appl. at 4 [AR-742].  Keys then certified he provided "true, correct and complete" information, and acknowledged he may be subject to a loss of benefits if he "made any false or misleading statements or omissions."  9/13/03 Appl. at 6 [AR-744].

Keys also **did not** submit the Janecki Accident Report with his application.  He provided another Dr. Janecki report which stated that Keys' impairments were related to NFL football, 9/4/13 Ltr. fr. C. Janecki [AR-1016], in direct contradiction of the Accident Report Dr. Janecki authored one month earlier.

Dr. Harlan Selesnick, a new neutral physician, evaluated Keys.  Dr. Selesnick reported that Keys had impairments to his knees, spine, and right shoulder, and opined that Keys, 43 at the time, was totally

and permanently disabled due to NFL football.  *See generally* 12/18/03 Phys. Rpt. Form [AR-829- 30];

12/18/03 Selesnick Rpt. [AR-831- 33].  Keys told Dr. Selesnick that Dr. Janecki was his doctor, but never

mentioned the May 7, 2002 car accident that led to his care and treatment with Dr. Janecki.  *See* 12/18/03

Selesnick Rpt. at 1 [AR-831] ("Most recently he has been followed by Dr. Chet Janecki in the Tampa area,

who has followed him orthopaedically as well as referred him for pain management consultation.").

The Disability Initial Claims Committee ("Committee")[10] had concerns about Keys' employment,

so it requested additional tax records, a Social Security Administration ("SSA") earnings statement, and a

description of Keys' work activity.  1/21/04 Ltr. fr. P. Scott to T. Keys [AR-874].  On February 17, 2004,

Keys provided the requested information.  2/17/04 Ltr. f. T. Keys to P. Scott [AR-875- 93].  Keys wrote:

> My work activity has been greatly reduced + restricted because of my disability + having
> to go to therapy (see attachment) 3 times a week.  I am only able to average 2 ½ hours a
> week, because I have to constant [sic] alternate between sitting and standing to make the
> calls to the students or college.  I am unable to perform substantial gainful activity at this
> time.

2/17/04 Ltr. f. T. Keys to P. Scott [AR-875].  The "therapy" that Keys referenced was that of Dr. Shaker,

the chiropractor who treated Keys after the May 7, 2002 car accident.  The referenced "attachment" was an

account statement for services rendered by Dr. Shaker continuously from May 10, 2002 through January

2004.  *See generally* 2/12/04 Patient Ledger Rpt. [AR-876- 82].

In March 2004, the Committee approved Keys' application and awarded him Inactive T&P

benefits, effective January 1, 2004.[11]  3/3/04 Ltr. fr. P. Scott to T. Keys [AR-960- 61].  The Committee's

decision letter did not elaborate on the basis for the Committee's decision to award Inactive rather than

Football Degenerative benefits.

Keys asked the Committee to reconsider its classification decision, arguing he was entitled to

Football Degenerative benefits because his disability arose out of NFL football activities.  *See* 4/7/04 Ltr.

fr. D. Anderson to Retirement Board [AR-1086- 87] (explaining request for further review).  To prove

---

[10] By 2004, the Retirement Plan created the Committee and gave it the responsibility of deciding initial applications
for benefits.  RPD § 8.5 [AR-38].

[11] The March 3, 2004 decision letter incorrectly states that the Retirement Board approved Keys' application.

football causation, Keys submitted approximately 50 pages of records, including old team records, prior Plan neutral physician reports, and examination and treatment records dated from May 2002 through September 2003.  *See* "MRI Reports + Medical Reports" [AR-968- 1023].  The examination and treatment records were complete with two exceptions.  Keys submitted just the last page of the Janecki Accident Report [AR-1007], and withheld the portions of the report that mentioned, and attributed his conditions and treatment to, the May 7, 2002 car accident.  Keys also provided page two of an undated note signed by Dr. Shaker, which stated:

> These imaging studies revealed an abnormal degree of degenerative osteoarthritis in Mr. Keys' cervical spine, lumbar spine, and knees, which were all existing prior to the May 7, 2002, accident.  The arthritic lesions demonstrated are largely the result of his football activities.

[AR-1014].

On April 7, 2004, the Committee awarded Keys Football Degenerative benefits.  4/8/04 Ltr. fr. P. Scott to T. Keys [AR-1091- 92].  Keys then began to receive monthly payments from the Plans.  *See* 4/15/04 Ltr. fr. P. Scott to T. Keys [AR-1104- 05] (explaining increased benefits under the Retirement Plan); 4/15/04 Ltr. fr. P. Scott to T. Keys [AR-1106] (explaining added benefit under the Disability Plan).

**VI.    The Plan Reviews Keys' Eligibility And Requests Information.**

A back-and-forth between Keys and the Retirement Plan ensued over the next 15 years.  Keys typically wanted more benefits.  The Committee and Board continually questioned Keys' employment activities and his eligibility for benefits.

In 2004 and again in 2007, Keys asked the Plan to reclassify his benefits to the highest-paying category of T&P benefits ("Active Football"), retroactive to 1990.  11/29/04 Ltr. fr. T. Keys to R. Eves [AR-1147]; 7/13/07 Ltr. fr. T. Keys to P. Scott [AR-1271].  The Committee and Board denied those requests. 3/16/05 Ltr. fr. P. Scott to T. Keys [AR-1230- 32]; 8/20/07 Ltr. fr. P. Scott to T. Keys [AR-1354- 56]; 5/9/08 Ltr. fr. S. Gaunt to T. Keys [AR-1403- 07].

In 2008-2009, a member of the Committee determined that Keys' tax returns showed he was not totally and permanently disabled, leading to a deadlock and discontinuation of his T&P benefits.[12]  11/5/09 Ltr. fr. P. Scott to T. Keys [AR-1565- 66].  Keys appealed.  1/15/10 Ltr. fr. D. Anderson to P. Scott [AR-1600- 11]; 1/15/10 Ltr. fr. T. Keys to P. Scott [AR-1612].  On appeal, the Board requested additional information from Keys and, after further review, ultimately approved continuation of his benefits.  4/8/10 Ltr. fr. P. Scott to T. Keys [AR-1649]; 5/6/10 Ltr. fr. D. Bubley to P. Scott [AR-1650- 55]; 8/24/10 Ltr. fr. S. Gaunt to T. Keys [AR-1700].

In 2011, the Board terminated Keys' T&P benefits.  In May of that year, the Committee again deadlocked on whether to continue his benefits.  5/3/11 Ltr. fr. P. Scott to T. Keys [AR-1777- 78].  Keys appealed, 6/29/11 Ltr. fr. D. Bubley to P. Scott [AR-1789], and the Board affirmed the Committee's determination because (1) Keys' 2009 tax return showed income incompatible with total and permanent disability, and (2) Keys was not receiving SSA disability benefits (an independent basis for an award of T&P benefits under the Plan).  11/28/11 Ltr. fr. S. Gaunt to T. Keys [AR-1861- 62].

In 2012, Keys reapplied for T&P benefits.[13]  *See generally* 2/8/12 Application [AR-1869- 70].  The Committee denied the application because Keys appeared to be working.  3/5/12 Ltr. fr. P. Scott to T. Keys [AR-1927- 28].  Keys appealed.  5/25/12 Ltr. fr. W. Coffman to Retirement Board [AR-1941- 44].  The Board tabled the appeal to give Keys additional time to submit his 2010 and 2011 tax returns, as requested.  8/21/12 Ltr. fr. S. Gaunt to T. Keys [AR-2045].  Keys provided tax returns on September 14, 2012.  9/14/12 Ltr. fr. W. Coffman to Retirement Board [AR-2051- 91].  In November 2012, the Board granted Keys' application and awarded him Inactive B[14] benefits to be paid beginning on January 1, 2013, with a

---

[12] Players were asked to submit tax returns for the Committee's review and verification of unemployment.  *See, e.g.,* 8/6/08 Ltr. fr. P. Scott to T. Keys [AR-1413].

[13] In his application, Keys once again failed to disclose the May 7, 2002 car accident.  2/8/12 Application at 2 [AR-1870] (stating "none" in response to question asking Player to identify "all accidents, injuries, or illnesses that did no result from NFL football (for example, auto accidents) that may have caused or contributed in any way to any of the conditions" listed in the application).

[14] By this time, Inactive benefits had been renamed "Inactive B."

retroactive payment for the 13-month period from the effective month of December 2011 through

December 2012.  11/26/12 Ltr. fr. S. Gaunt to T. Keys [AR-2168- 71].

Keys appealed the Board's classification decision, arguing that he was entitled to higher-paying

Inactive A benefits.[15]  2/7/13 Ltr. fr. T. Keys to Retirement Board [AR-2180 -200].  The Board initially

denied Keys' appeal.  5/16/13 Ltr. fr. S. Gaunt to T. Keys [AR-2301- 03].  However, the Board

reconsidered its decision and temporarily reclassified Keys' benefits as Inactive A subject to several

conditions:

- Keys had to assist the Plan in obtaining his federal income tax returns from 2004 through 2012 from the IRS by completing the necessary form;

- Keys had to assist the Plan in obtaining his SSA disability file from the SSA by completing the necessary form; and

- Keys had to provide a full and complete list of all employment and/or activities for profit that he engaged in from January 2004 to the present, describing the dates of his involvement, b) the earnings he received in each calendar year, and c) his duties and activities.

12/16/13 Ltr. fr. M. Miller to T. Keys [AR-2312- 15].  The Board informed Keys that his prompt

cooperation was required to ensure continuation of his benefits at the Inactive A level.  12/16/13 Ltr. fr. M.

Miller to T. Keys at 4 [AR-2315].

A year went by before Keys responded to the Board's requests.  12/16/14 Ltr. fr. C. Deem to M.

Miller [AR-2325- 73].  In February 2015, the Board considered Keys' response, found it insufficient, and

suspended his benefits until he complied.  3/13/15 Ltr. fr. M. Miller to T. Keys [AR-2436- 39].

In May 2015, Keys provided some of the information sought by the Board.  5/22/15 Ltr. fr. C.

Deem to M. Miller [AR-2451- 56].  The Board reviewed that submission in expedited fashion and

reinstated Keys' Inactive A benefits, effective December 1, 2013, pending receipt of additional information

from the IRS and the SSA.[16]  7/23/15 Ltr. fr. M. Miller to C. Deem [AR-2511- 13].

---

[15] By this time, Football Degenerative benefits had been renamed "Inactive A."

[16] The IRS and SSA initially rejected the releases that Keys provided because Keys included incorrect or incomplete information, such as the incorrect address or social security number.  *See* Memo. fr. D. Ell to Retirement Board at 1 [AR-3453] (describing reasons the IRS and SSA rejected prior releases).

**VII.   Keys' Fraud is Uncovered, and the Board Reduces and Suspends Keys' T&P Benefits To Recover Prior Overpayments.**

The Board asked Plan Counsel to review Keys' file, SSA documentation, and additional documents provided by Keys throughout 2016 and early 2017.  They presented their findings in February 2017:

> We were asked to review the file, which has over 2,000 pages and goes back decades.  We uncovered a number of troublesome items, such as (1) Keys claimed that injuries from an auto accident were instead caused by NFL football, and provided only selected pages from medical reports to foster that impression, (2) Keys may have misrepresented his work activities (he told SSA he was working 6 hours a day while he was collecting Plan T&P benefits (2004 to 2009) and he took tax deductions for business travel during that period), (3) Keys has obstructed the Plan's attempts to obtain his tax and SSA records, (4) Keys failed to report worker compensation benefits that should have offset his LOD benefits, and (5) Keys may have received SSA benefits because of fraud.

Plan Counsel "Overview" at 4-5 [AR-3449- 50].  Plan Counsel produced a 12-page memo detailing the "troublesome items" identified in Keys' records.  *See generally* Memo. fr. D. Ell to Retirement Board [AR-3453- 64, **Ex. A**] (summarizing Plan Counsel's findings for Board).[17]  The Board suspended Keys' benefits and directed him to address questions set forth in a March 22, 2017 letter.  *See generally* 2/28/17 Ltr. fr. M. Miller to T. Keys [AR-3494- 98, **Ex. B**]; 3/22/17 Ltr. fr. M. Miller to T. Keys [AR-3534- 44, **Ex. C**].

An exchange of correspondence followed.  On May 1, 2017, Keys' representative responded to the Board's questions.  *See generally* 5/1/17 Ltr. fr. G. Culverhouse to Cmte. Members [AR-3706- 87].  At its May 17, 2017 meeting, the Board found Keys' response incomplete, and directed that a follow-up letter be sent.  *See generally* 5/19/17 Ltr. fr. M. Miller to G. Culverhouse [AR-3843, **Ex. D**].  On June 4, 2017, Keys' representative provided additional information.  *See generally* 6/4/17 Ltr. fr. G. Culverhouse to Benefits Cmte. [AR-3820- 41].

In August 2017, Plan Counsel presented its analysis of Keys' response to the Board:

> Keys admits he was injured in a car accident on May 7, 2002.  This is significant because the extensive medical care for the injuries that were the basis for Keys' Football Degenerative T&P benefits commenced on May 10, 2002, just three days after the accident.  Keys also provided, for the first time, a 2003 IME report evaluating injuries from the car accident.  The IME report attributes Keys' extensive medical treatment to the

---

[17] Space does not permit a full recitation of Keys' repeated failures to provide complete and accurate information.  It also does not allow a full discussion of inconsistencies identified in the documents Keys provided.  We urge the Court to review the Board memoranda and decision letters, which detail the extent of Keys' fraud and concealment.  Those letters are annexed to this brief as **Exhibits A through H.**

> car accident. You may recall that Keys wrote on his application for disability, submitted
> in the fall of 2003, "All injuries were the direct result of Pro Football unfortunately." We
> now have conclusive evidence that representation was false.

Plan Counsel "Overview" at 4 [AR-3996]. As before, Plan Counsel prepared a memo outlining the

inconsistencies in the record. *See generally* 8/9/17 Memo fr. J. Wilson to D. Ell [AR-4002- 25, **Ex. E**].

The Board unanimously determined Keys was never entitled to Football Degenerative benefits, but rather

Inactive benefits, and therefore the Plans overpaid him in an amount representing the difference between

the Football Degenerative benefits he received and the Inactive benefit to which he was entitled. *See*

*generally* 8/30/17 Ltr. fr. M. Miller to T. Keys [AR-4045- 67, **Ex. F**]. To partially recover the

overpayment, the Board suspended future benefit payments to Keys, and reserved the right to "take sure

further action as it may deem appropriate." 8/30/17 Ltr. fr. M. Miller to T. Keys at 1 [AR-4045]. The

Board allowed Keys to appeal its decision. 8/30/17 Ltr. fr. M. Miller to T. Keys at 3 [AR-4047].

Keys had not yet appealed the reduction and suspension of his benefits when the Board met in

November 2017. However, Plan Counsel reported that SSA documents obtained since the Board's August

meeting revealed (1) Keys misrepresented to the SSA that a Plan neutral physician was a treating

physician; (2) Keys misrepresented his home address to SSA; (3) Keys' wife misrepresented Keys'

condition to the SSA; and (4) Keys told the SSA that he worked through April 1, 2007, and received sick

pay through June 30, 2009. *See generally* 11/7/17 Plan Counsel "Overview" at 3 [AR-4127]; 10/25/17

Memo. fr. J. Wilson to D. Ell [AR-4147- 65, **Ex. G**].

In February 2018, Keys' representative appealed the Board's reduction-and-suspension decision.

*See generally* (undated) Ltr. fr. G. Culverhouse to Retirement Board [AR-4249- 379]. On February 22,

2018, the Board unanimously denied the appeal:

> [T]he Retirement Board upheld its prior determination that (1) Keys intentionally omitted
> and misrepresented material facts surrounding [his] 2003 application for T&P benefits;
> (2) [his] omissions and misrepresentations subject [him] to a loss of benefits; (3) if [he]
> were entitled to T&P benefits at all, [he] should have received the Inactive/Inactive B
> category of T&P benefits, not Football Degenerative, resulting in an overpayment to
> [him] of $831,488.28, excluding interest; and (4) to partially recover this overpayment,
> [his] Plan T&P benefits would be terminated.

2/26/18 Ltr. fr. M. Miller to T. Keys at 1 [AR-5277, **Ex. H**].  The Board reserved the right to take

additional steps to recover the overpayments.  2/26/18 Ltr. fr. M. Miller to T. Keys at 1 [AR-5277].  Before

the Board could take any additional action, Keys initiated this litigation.

## ARGUMENT & AUTHORITIES

### I.      THE PLANS ARE ENTITLED TO SUMMARY JUDGMENT ON KEYS' CLAIMS.

####       A.      Count I fails because substantial evidence supports the Board's decision.

Count I challenges the Board's decision to reduce and suspend Keys' T&P benefits.  Am. Compl.

(ECF 35) ¶ 36.  Because the Board has full discretionary authority to interpret the Plan and decide claims

for benefits, the Court will review the Board's decision only for abuse of that discretion.  *Firestone Tire &*

*Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Doyle v. Liberty Life Assur. Co. of Bos.,* 542 F.3d 1352,

1356 (11th Cir. 2008).

> In the ERISA context, [a]buse of discretion review is synonymous with arbitrary and
> capricious review.  This standard requires only that substantial evidence supports the plan
> fiduciary's decision.  Substantial evidence is more than a scintilla, less than a
> preponderance, and is such relevant evidence as a reasonable mind might accept as
> adequate to support a conclusion.  A decision is arbitrary only if made without a rational
> connection between the known facts and the decision or between the found facts and the
> evidence.  Moreover, this court's review of the administrator's decision need not be
> particularly complex or technical; it need only assure that the administrator's decision
> fall[s] somewhere on a continuum of reasonableness—even if on the low end.

*Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 694 F.3d 557, 566 (5th Cir. 2012) (alterations in

original) (citations and internal quotation marks omitted).[18]  The goal is "to avoid judicial second

guessing/intrusion by according the most judicial deference (and thus, the least judicial scrutiny)" to the

Board's decisions.  *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004),

*overruled on other grounds by Doyle v. Liberty Life Assur. Co. of Bos.*, 542 F.3d 1352 (11th Cir. 2008).[19]

---

[18] *See also Emery v. Am. Airlines, Inc.*, 56 F. Supp. 3d 1284, 1302 (S.D. Fla. 2014) (noting that substantial evidence is "more than a scintilla, but less than a preponderance," and it "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotation marks omitted).

[19] Keys does not allege the Board operates under a "conflict of interest," and every court to consider the question has held that the Board has no conflict as a matter of law.  *See Johnson v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,

The Plans are entitled to summary judgment on Count I because Keys cannot show the Board abused its discretion.  While Keys disputes certain facts and inferences drawn from facts, the Court need not decide whether Keys' excuses are valid.  The standard of review requires absolute deference to the Board's determination so long as substantial evidence supports it.  And here, there is no question that substantial, record evidence supports the Board's decision.

> **1.      The Board reasonably concluded the car accident was the "but for" cause of Keys' disability, and therefore he was not entitled to Football Degenerative benefits.**

To receive Football Degenerative benefits, a Player's total and permanent disability must arise out of League football activities.  RPD § 5.1(c) [AR-25].  The Plan defines "arising out of League football activities," and specifies that it "does not include… a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities."[20]  RPD § 6.4(c) [AR-32].  The Board reasonably determined the car accident was the "but for" cause of Keys' total and permanent disability, and, consequently, Keys was not entitled to Football Degenerative benefits.

From 1991 through 1999, Dr. Unger evaluated Keys on an annual basis and reported that he was employable with little or no change in his condition.  *See supra* at 5 and n.8.  The Board twice considered and denied Keys' request for T&P benefits based on Dr. Unger's findings and a lack of any "significant medical information."  5/7/96 Ltr. fr. S. Gaunt to T. Keys at 1 [AR-557]; *see* 2/3/97 Ltr. fr. S. Gaunt to T. Keys [AR-606] (denying request for T&P benefits after Keys failed to provide information demonstrating his disability).

---

468 F.3d 1082, 1086 (8th Cir. 2006) (Board has no conflict of interest); *Courson v. Bert Bell NFL Player Ret. Plan*, 75 F. Supp. 2d 424, 431 (W.D. Pa. 1999), *aff'd*, 214 F.3d 136 (3d Cir. 2000) (no conflict of interest requiring a more stringent standard of review); *Morris v. Nat'l Football League Ret. Bd.*, 833 F. Supp. 2d 1374, 1386 (S.D. Fla. 2011), *aff'd*, 482 F. App'x 440 (11th Cir. 2012) (same).

[20] *See Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1179 (9th Cir. 2005) (upholding the Board's application of the "but for" causation standard in the context of conflicting medical evidence); *Webster v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 129 F.3d 607 (5th Cir. 1997) (per curiam) (upholding Board's "but for" causation standard).

Things changed after the car accident.  Dr. Shaker and Dr. Janecki began treating Keys within days of the accident, and continued to treat him for the next year or more.  In August 2003, Dr. Janecki reported that Keys' neck, back, and knee injuries—the same disabling impairments Keys identified in his September 2003 application, 9/13/03 Appl. at 4 [AR-742]—were "the <u>direct result of injuries</u>" sustained in the car accident.  Janecki Accident Report at 3 [AR-3588].  According to Dr. Janecki:

- Keys "continue[d] to have symptoms without remission during the course of the last year and 3 months since his accident;"

- Keys had "<u>permanent impairment with permanent loss</u> of important bodily functions and <u>permanent restrictions</u> in terms of his activities of daily living and his occupation;"

- Keys had "not been restored to his pre-injury state and continue[d] to have substantial symptoms in his cervical and lumbar spine as well as his left knee;" and

- Keys' "symptoms ha[d] worsened during the course of the last year" following the accident.

Janecki Accident Report at 1, 3 [AR-3586, 3588].

In September 2003, Keys reapplied for T&P benefits.  A Plan neutral physician evaluated Keys in connection with that application and, for the first time ever, found Keys totally and permanently disabled.

When the full facts became known, it was reasonable for the Board to conclude the car accident was the real "but for" cause of Keys' total and permanent disability.  The Board had the right and duty to weigh and resolve conflicting evidence.  *Howard v. Hartford Life & Acc. Ins. Co.*, 929 F. Supp. 2d 1264, 1288 (M.D. Fla. 2013) (citing *Townsend v. Delta Family–Care Disability and Survivorship Plan*, 295 F. App'x 971, 977 (11th Cir. 2008)); *Manning v. Johnson & Johnson Pension Comm.*, 504 F. Supp. 2d 1293, 1301 (M.D. Fla. 2007) ("[A]n administrator's decision that rejects certain evidence and credits conflicting proof may nevertheless be reasonable.").  Yes, Keys did have orthopedic impairments before the car accident, but Plan neutral physicians had repeatedly found him able to work despite those impairments.  Yes, Plan neutral physicians did state that the cause of Keys' inability to work was NFL Football, but those physicians were evaluating the impairments presented, without knowledge of the car accident.  They accepted as true Keys' false statement that all impairments were the result of NFL Football.

Keys will downplay the significance of the car accident and the Janecki Accident Report, and say the Board unreasonably based its decision on this evidence.  But why would Keys conceal the car accident

if it were as inconsequential as he claims?  He did it because he knew that, if the car accident and the Janecki Accident Report came to light, a reasonable person could conclude that the accident—and not NFL football—was the proximate cause of his total and permanent disability, and he would not be entitled to the higher level of Football Degenerative T&P benefits.[21]

## 2. The Board reasonably determined that Keys' history of false, incomplete, and contradictory statements subjected him to a loss of benefits.

Keys certified he would provide true, correct, and complete information to the Retirement Plan, and acknowledged he would be "subject to loss of benefits and to other penalties and sanctions" if he did not.  9/13/03 Appl. at 6 [AR-744]; *see* 11/11/91 Appl. [AR-441] (certifying that "all information on this form is true to the best of my knowledge").  Plan Counsel's thorough analysis of the record—distilled in a series of comprehensive memos to the Board—revealed an alarming pattern of false statements and incomplete submissions stretching back to Keys' first application for LOD benefits in 1991.  Given this pattern, not only was it reasonable for the Board to reject Keys' attempts to downplay the car accident, it was reasonable for the Board to reduce Keys' benefits on this basis alone.  *See Digiacomo v. Prudential Ins. Co. of Am.*, 501 F. Supp. 2d 626, 634 (D.N.J. 2007) (upholding administrator's decision to terminate disability benefits due to participant's allegedly fraudulent statements concerning the extent of his physical limitations); *see also Lawrence v. Gen. Motors Hourly-Rate Emps. Pension Plan*, No. 5:07-CV-408, 2010 WL 3788279, at *12 (M.D. Fla. Sept. 24, 2010) ("A person who owes the plan money is simply treated as having been paid in advance and is not entitled to a resumption of payments until there is a net balance due from the Plan.").

---

[21] Keys' representation that Dr. Janecki was willing to say whatever was necessary for Keys to obtain benefits, 5/1/17 Ltr. fr. G. Culverhouse to Cmte. Members at 5 [AR-3710], does not make Dr. Janecki's September 2003 report (which attributed Keys' impairments to NFL football) any more credible than the August 2003 Accident Report.

a)    **Substantial evidence shows Keys concealed material evidence he knew would adversely impact his T&P application, and falsely represented that his conditions and the treatments for them were due solely to his NFL career.**

Immediately following the car accident, and continuing through the date of Keys' September 2003 application for T&P benefits, Dr. Shaker and Dr. Janecki treated Keys for impairments related to that car accident. Keys did not disclose the accident, despite being prompted to "[d]escribe all accidents, injuries, or illnesses that did not result from NFL Football (*for example, auto accidents*) and may have caused or contributed in any way" to his alleged disability. 9/13/03 Appl. at 4 [AR-742] (emphasis added). Even worse, when Keys had to prove NFL football caused his disability in his pursuit of Football Degenerative benefits, he disassembled the four-page Janecki Accident Report, concealed any reference to the car accident and resulting injuries, and repeatedly misrepresented the true nature of his ongoing treatment with Dr. Shaker and Dr. Janecki.

The Board reasonably rejected Keys' shifting "attempts to paint [his] failure to disclose the May 7, 2002 car accident as an innocent oversight." 2/26/18 Ltr. fr. M. Miller to T. Keys at 3 [AR-5279]. The claim that Keys "never thought of the accident" when applying for T&P benefits in 2003, 5/1/17 Ltr. fr. G. Culverhouse to Cmte. Members at 5 [AR-3710], is implausible. Keys obviously had the accident in mind when he carved up the Janecki Accident Report to avoid any mention of it, and later submitted records documenting treatments he received *for the accident*. Keys' fallback explanation—that his 2003 application was "accurate" because the accident he concealed, the treatment records he misrepresented, and the Janecki Accident Report he took apart are all "compatible," (undated) Ltr. fr. G. Culverhouse to Retirement Board at 8 [AR-4256]—does not erase his concealment or make his application any less incomplete. And, as the Board explained, if Keys truly believed the car accident and all of the records were "compatible" with his claim that he was totally and permanently disabled due to NFL football, then why not disclose everything, and "provide full copies of *both [Janecki] reports* with [his] 2003 application for T&P benefits?" 2/26/18 Ltr. fr. M. Miller to T. Keys at 4 [AR-5280].

b)      **Substantial evidence shows Keys did not disclose his receipt of workers' compensation benefits to avoid an offset.**

Keys admits he received workers' compensation benefits while he received LOD benefits from the Plan.  12/18/91 Op. on Reconsid. [AR-1150- 51]; 5/1/17 Ltr. fr. G. Culverhouse to Cmte. Members at 5 [AR-3710].  Substantial evidence shows Keys avoided an offset by backdating his LOD application to a date preceding his November 26, 1991 workers' compensation award; falsely representing he had a "pending" workers' compensation matter; and then ignoring repeated reminders informing him of his obligation to report a workers' compensation award.

Keys' attempt to call his failure to disclose "a timing error" on the part of his attorney is irrelevant, and only documents his continual efforts to deceive the Board.  *See* 5/1/17 Ltr. fr. G. Culverhouse to Cmte. Members at 4 [AR-3710].  Keys completed the LOD application on his own.  *See* 11/11/91 Appl. [AR-441] (showing that Keys completed the application in his own handwriting).  Even if "a timing error" credibly explained Keys' ***initial*** failure to disclose the workers' compensation award, it does not explain Keys' ***continued*** failure to disclose the award after receiving no less than five separate reminders from the Plan.

c)      **Substantial evidence shows Keys provided false and contradictory information to the SSA about a number of things, including his ability to work.**

Keys' SSA files revealed equally troubling conduct.  To obtain benefits from the SSA:

- Keys falsely claimed he lived in Mississippi, presumably to seek benefits in a more favorable venue (after first being denied SSA benefits altogether);
- Keys passed off the Retirement Plan's neutral physicians as his own personal, treating physicians, knowing that the Administration defers to treating physicians; and
- Keys represented he was gainfully employed as late as 2009 and capable of performing work-related activities (sitting, standing, driving, etc.), in direct contradiction of what he told the Plan.

Putting aside the question of whether and to what extent Keys defrauded a federal agency, the information Keys provided to the SSA demonstrates his submissions to the Plan were not true, correct, or complete.

Keys is admittedly "unable to explain the discrepancies" between what he told the SSA and the Retirement Plan, but calls the contradictions "irrelevant."  5/1/17 Ltr. fr. G. Culverhouse to Cmte. Members at 5 [AR-3710].  To the contrary, Keys' capabilities are directly relevant to his entitlement to benefits from

the Retirement Plan and the SSA.  The only logical conclusion, as the Board noted, is Keys

"misrepresented [his] work capabilities to the Plan when it benefitted [him] to do so, or [he] misrepresented

[his] work capabilities to the [SSA] when it benefitted [him] to do so."  2/26/18 Ltr. fr. M. Miller to T.

Keys at 4-5 [AR-5280- 81].  Either scenario "adversely impacts [Keys'] entitlement to Plan T&P benefits"

because it undermines his 2003 and 2012 applications.[22]  2/26/18 Ltr. fr. M. Miller to T. Keys at 5 [AR-

5281].

**B.** **Count II fails because the Board reasonably determined Keys was *never* entitled to Football Degenerative benefits.**

In Count II, Keys seeks a retroactive award of Football Degenerative/Inactive A benefits for

December 2011 through November 2013.  Am. Compl. ¶ 37.  Keys was receiving Inactive/Inactive B

benefits during this timeframe, as the Board reviewed the facts and circumstances surrounding his

applications.  In July 2015, the Board provisionally reinstated Keys' Football Degenerative/Inactive A

benefits, retroactive to December 2013.  7/23/15 Ltr. fr. M. Miller to C. Deem [AR-2511- 13].  Keys

alleges the Board was wrong at that time, and the Plan should have paid him Football

Degenerative/Inactive A benefits retroactive to December 2011, given the date of his renewed, 2012

application and his Social Security award.  Am. Compl. ¶ 38.

The Plans are entitled to summary judgment on Count II because the Board's reasonable

determination that Keys was ***never*** entitled to Football Degenerative benefits necessarily means his claim

for reinstatement of those benefits during the timeframe at issue is moot.

**II.** **THE PLANS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST KEYS ON THEIR COUNTERCLAIMS.**

**A.** **The Plans are entitled to equitable relief to recover nearly $1 million in overpayments.**

The Plans' administrators have the authority to recover overpayments through any method they

choose.  RPD § 8.2(n) [AR-37].  *See also* 4/1/17 RPD § 8.2(o) [AR-205]; 4/1/17 DPD § 9.2(o) [AR-353].

---

[22] In 2012, Keys reapplied for T&P benefits and provided evidence of a favorable SSA disability award. At that time, a Player would be deemed to be totally and permanently disabled if he had received an SSA disability award, unless the Board found the Player had secured his Social Security benefits by fraud.  8/1/11 RPD § 5.2(b) [AR-98].

Pursuant to that authority, the Plans brought counterclaims seeking equitable relief in the form of a constructive trust and/or an equitable lien to obtain a full recovery of the amounts overpaid to Keys. Countercls. (ECF 39) ¶¶ 27, 55, 56.  The Plans are entitled to summary judgment on these claims.

Keys contests the Plan's right to recover overpayments, but he does not dispute the basic amount of the overpayments at issue.  Keys admittedly received at least $39,130 in workers' compensation benefits that were not offset against his LOD benefits, leading to an overpayment in that amount.  12/18/91 Op. on Reconsid. [AR-1150- 51]; Bagosy Decl. ¶ 3.  Because Football Degenerative/Inactive A benefits are richer than Inactive/Inactive B benefits, the Plans also overpaid Keys every time he received Football Degenerative/Inactive A benefits instead of Inactive/Inactive B.  *See* Bagosy Decl. ¶¶ 4-6 (establishing amount of overpaid disability benefits, and noting "credit" due to prior underpayments and ongoing hold of disability benefits).

The minimal discovery taken in this case establishes that Plan funds can be traced to assets in Keys' possession.  *See* Second Am. Ans. To Defs.' Interrog. 3 (**Ex. K**) (identifying accounts that contain Plan funds, and stating that additional accounts "probably contain some NFL Player Plan funds…"); Depo. of Bessie Keys (**Ex. L**) at 51:20- 52:14 (stating that she is unable to rule out any one of 13 accounts identified in Plaintiff's Second Amended Answer to Defendants' Interrogatories as containing NFL Player Plan funds); Depo. of Tyrone Keys (**Ex. M**) at 78:19- 25 (conceding that NFL Player Plan funds ended up in all but two of 13 accounts identified in Plaintiff's Second Amended Answer to Defendants' Interrogatories).  The Plans are accordingly entitled to the equitable relief they seek.  *See, e.g.*, *Great-W. Life &Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) (a constructive trust is available "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession").

**B.      The Plans are entitled to judgment against Keys to prevent his unjust enrichment.**

A claim of unjust enrichment lies where "(1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of such benefit, and (3) acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying

the value thereof." *Unum Life Ins. Co. of Am. v. O'Brien*, No. 6:03-CV1433-ORL18DAB, 2004 WL 2283559, at *5 (M.D. Fla. Oct. 4, 2004); *Hercules, Inc. v. Pages*, 814 F. Supp. 79, 80 (M.D. Fla. 1993); *Metro. Life Ins. Co. v. Solomon*, 996 F. Supp. 1473, 1475 (M.D. Fla. 1998); *see also Luby v. Teamsters Health, Welfare, & Pension Tr. Funds*, 944 F.2d 1176, 1186 (3d Cir. 1991) (an ERISA plan is entitled to restitution to recover mistaken payments from the plan trust).

A federal common law claim for unjust enrichment "furthers the purposes of ERISA" and Congress' "desire to ensure that plan funds are administered equitably and that no one party, not even beneficiaries, should unjustly profit." *Unum Life Ins.*, 2004 WL 2283559, at *4. In *Metro. Life Ins. Co. v. Solomon*, this Court found the plaintiff had a claim for unjust enrichment when a clerical error led the plan to cut a check to the defendant, and the defendant refused to return the funds. 996 F. Supp. at 1475. The plan sued for reimbursement, and the Court ruled that the three elements of unjust enrichment were met and that "it would be inequitable to allow [the defendant] to retain the check." *Id.* at 1477. *See also Hercules*, 814 F. Supp. at 80 (the doctrine of unjust enrichment is appropriate where it would further the provisions of the benefit plan or ERISA); *Provident Life & Acc. Ins. Co. v. Waller*, 906 F.2d 985, 993 (4th Cir. 1990) (holding that a claim for unjust enrichment lies to recover funds advance to an ERISA plan participant that the participant then refused to repay pursuant to the plan document, reasoning that the doctrine of unjust enrichment "would *further* the contract between the parties" and would be consistent with ERISA.).

Here, the Plans are entitled to recover against Keys under the doctrine of unjust enrichment. The Plans unquestionably conferred a benefit upon Keys in the amount of the LOD and T&P overpayments, and Keys enjoyed the use of those funds. It would be inequitable for Keys to retain those funds, particularly at the expense of other deserving participants. *See Unum Life Ins.*, 2004 WL 2283559, at *4 (Congress did not "intend[] beneficiaries to be rewarded by overpayments to which they are not entitled."). Although the Board determined that Keys secured the overpayments via submission of false, incomplete, and misleading information, the Plans need not establish that Keys engaged in wrongdoing to obtain the overpaid funds; the Plans need only establish that retention of the overpayment would be inequitable. *See Metro. Life Ins.*, 996 F. Supp. at 1475.

**C.     Keys' Affirmative Defenses To The Plans' Counterclaims Are Meritless.**

**1.     The Court should reject Keys' exhaustion argument.**

Keys will argue the Plan's claim to recover LOD overpayments is barred because the Board failed to exhaust administrative remedies.  This argument fails because (1) the Board raised the LOD overpayment issue during the administrative process, *see, e.g.*, 2/28/17 Ltr. fr. M. Miller to T. Keys at 1 [AR-3494] (noting that the Retirement Board may seek recovery for overpaid LOD benefits), and (2) the Board is not required to exhaust administrative remedies prior to filing suit.  *See, e.g.*, *Reliance Standard Life Ins., Co. v. Smith*, No. 3:05-cv-467, 2006 WL 2993054, *3 (E.D. Tenn. Oct. 18, 2006) ("As Reliance is not a beneficiary/participant under the plan, it is not required to exhaust any administrative procedures on the overpayment claim.").

**2.     The Court should reject Keys' limitations argument.**

Keys will argue the Plans' claims are barred by their own limitations provision.  However, that provision governs Players' claims against the Plans, not claims the Plans might bring against Players.  Even if the limitations provision did govern the Plans' claims, the limitations period extends 42 months "from the date of the final decision on the claim for benefits."  4/1/17 RPD § 12.7(a) [AR-220]; 4/1/18 DPD § 13.4(a) [AR-362] (same).  The Board made its final determination on February 22, 2018.  Therefore, the Plans' counterclaims are timely.

**3.     The Court should reject Keys' waiver argument.**

Keys cannot show the Plans waived the right to recover overpayments.  Waiver is "the voluntary, intentional relinquishment of a known right."  *Witt v. Metro. Life Ins. Co.*, 772 F.3d 1269, 1279 (11th Cir. 2014) (quoting *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1347 (11th Cir. 1994)).  It "requires '(1) the existence[,] at the time of the waiver[, of] a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit.'"  *Witt*, 772 F.3d at 1279 (alterations in original) (quoting *In re Garfinkle*, 672 F.2d 1340, 1347 (11th Cir. 1982)).  The Plans waived nothing.  They reserved "all rights to take such further action as [the Board] may deem appropriate."  8/30/17 Ltr. fr. M. Miller to T. Keys at 1 [AR-4068];

*see also* 2/26/18 Ltr. fr. M. Miller to T. Keys at 1 [AR-5277] (noting the Board "reserves all rights" to take additional steps to collect overpayments).

      4.      **The Court should reject Keys' argument that the Plan terms do not authorize equitable relief.**

      To avoid the Plans' overpayment claims, Keys will say the Plans' overpayment provision authorizes the Board to reduce future benefit payments or take some additional action to recover an overpayment, but not both.  This argument contradicts the express terms of the Plans; it undermines fundamental ERISA principles; and it does not apply to the Disability Plan in any event because the Disability Plan has not reduced future benefit payments.

      The Plan Documents authorize the Plans' administrators to "[r]ecover any overpayment of benefits through reduction or offset of future benefit payments or other method chosen by the" Plan administrators. 4/1/17 RPD § 8.2(o) [AR-205]; 4/1/17 DPD § 9.2(o) [AR-353].  The plain intent of the provision is to give the Plans' administrators the broadest possible power and authority to recover overpayments, which are Plan assets that the Plans' fiduciaries are duty-bound to preserve for the benefit of all participants.  *See* 29 U.S.C. § 1001(b); *see also Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Const. Co.*, 932 F.2d 1443, 1450 (11th Cir. 1991) ("one of the fundamental common law duties of a trustee is to preserve and maintain trust assets," which requires the trustees to "discover the location of the trust property and to take control of it") (emphasis omitted).

      Keys' interpretation of the overpayment provision is quite strained, to say the least, and would lead to absurd results.  It would mean that if the Plans choose to offset Keys' future benefits (as the Retirement Plan has so far done), the Plans would never fully recover because the overpayment far exceeds the value of Keys' future disability benefits.  If, on the other hand, the Plans choose to recover the overpayment through some means that do not include offset, the Plans would have to continue (over)paying Keys disability benefits each month even though he had already received a massive overpayment.  The Plans should not have to make this binary, Hobson's choice.

If there is any question about the breadth of the Plans' overpayment provision, the Court should defer to the Board's view that the provision permits the Plans to recover overpayments through both a reduction of future benefits together with any other method necessary to accomplish the purpose of the provision. *See Conkright v. Frommert*, 559 U.S. 506, 512 (2010) ("If the trust documents give the trustee power to construe disputed or doubtful terms, the trustee's interpretation will not be disturbed if reasonable.") (internal quotation marks omitted); *Blue Heron Beach Resort Developer, LLC v. Branch Banking &Tr. Co*., No. 6:13-CV-372- ORL-36, 2014 WL 2625255, at *7 (M.D. Fla. June 12, 2014) (while "the word 'or' is a disjunctive participle… there are, of course, familiar instances in which the conjunctive 'or' is held equivalent to the copulative conjunction 'and,' and such meaning is often given the meaning 'or' in order to effectuate the intention of the parties as to a written instrument….").

No matter how the Plans' overpayment provision is interpreted, it does not bar the Disability Plan's claims in this litigation because the Disability Plan is not paying Keys benefits, and therefore it is offsetting nothing.  Keys' debt to the Disability Plan was and is $744,884.00, exclusive of interest.  By Keys' own logic, the Disability Plan has every right to bring a claim to recover this overpayment.

## CONCLUSION

The Court should enter judgment in favor of the Plans and against Keys on each of Keys' affirmative claims, as well as on each of the Plans' counterclaims.

Dated:  November 15, 2019

By:

_____

Michael L. Junk, *pro hac vice*
Katherine B. Kohn, *pro hac vice*
GROOM LAW GROUP, CHARTERED
 1701 Pennsylvania Ave. NW
 Washington, DC 20006
 T: (202) 857-0620
 F: (202) 659-4503
 E: mjunk@groom.com
 E: kkohn@groom.com

Brian D. Equi (Florida Bar ID No. 143936)
GOLDBERG SEGALLA
 800 North Magnolia Avenue, Suite 1201
 Orlando, Florida 32803
 T: (407) 458-5605
 F: (407) 458-5699
 E: bequi@goldbergsegalla.com

*Counsel for Defendants / Counter-Plaintiffs
Bert Bell/Pete Rozelle NFL Player Retirement Plan
and NFL Player Disability & Neurocognitive
Benefit Plan*